# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v KABONGO

Docket No. 159346. Argued November 10, 2020 (Calendar No. 3). Decided May 20, 2021.

Jacques J. Kabongo was convicted of carrying a concealed weapon, MCL 750.227, following a jury trial in the Wayne Circuit Court. Two police officers testified that they had seen defendant cover a holstered handgun with his shirt and that defendant's license to carry a concealed weapon had expired. The trial court, Catherine L. Heise, J., sentenced defendant to one year of probation and 50 hours of community service. Defendant appealed by right, arguing, among other things, that the trial court had erred by overruling his objections to the prosecutor's use of peremptory challenges to excuse Prospective Jurors 2(a), 3(a), and 14(a), all of whom were Black, and by disallowing defendant's use of a peremptory challenge to excuse Prospective Juror 5(a), who was white. The Court of Appeals, MURRAY, C.J., and METER and GLEICHER, JJ., affirmed in an unpublished per curiam opinion issued December 27, 2018 (Docket No. 338733). Defendant sought leave to appeal in the Supreme Court, which granted the application with respect to (1) whether the prosecution's exercise of a peremptory challenge against Prospective Juror 2(a) violated *Batson v Kentucky*, 476 US 79 (1986), which prohibits the prosecution from using a peremptory challenge to remove a prospective juror solely on the basis of race; (2) whether the trial court erroneously precluded defendant from exercising a peremptory challenge against Prospective Juror 5(a), given that the same analytical framework from *Batson* applies when the prosecution opposes a defendant's use of a peremptory challenge on the basis of alleged racial discrimination; (3) if so, whether such an error should be subject to automatic reversal or harmless-error review; and (4) if so, whether reversal was warranted. 505 Mich 999 (2020).

The judgment of the Court of Appeals was affirmed by equal division.

Justice ZAHRA, joined by Justices VIVIANO and CLEMENT, writing for affirmance, concluded that although the evidence was open to interpretation, the trial court had not clearly erred by finding that the prosecution's race-neutral explanation for using a peremptory challenge to excuse Prospective Juror 2(a) was not a pretext for improper purposeful discrimination. However, Justice ZAHRA concluded that the trial court did clearly err by determining that defense counsel's race-neutral explanation for seeking to excuse Prospective Juror 5(a) was a pretext for discrimination. While defense counsel's comments may have suggested an intent to discriminate against white prospective jurors during voir dire, the record did not reflect that defense counsel

actually engaged in purposeful discrimination against this particular prospective white juror, given that she had extensive familial ties to law enforcement and the sole evidence against defendant was to be the testimony of law enforcement officers. Nevertheless, Justice ZAHRA would have held that the court's denial of defendant's peremptory challenge was not a structural error requiring automatic reversal under Michigan law. He noted that the Supreme Court of the United States has recognized that states need not even provide peremptory challenges, and if a state does so, then the state is free to decide the remedy available for a trial court's mistaken denial of a peremptory challenge. He stated that Michigan law provides no basis for a rule that would require automatic reversal when a trial court denies a peremptory challenge on the basis of an improperly granted *Batson* challenge, because Michigan law generally views peremptory challenges as a nonconstitutional right that is provided to both parties as one of the many optional means to secure the constitutional guarantee of an impartial jury. Accordingly, he would have held that a trial court's erroneous denial of a defendant's peremptory challenge is subject to harmless-error review and that under this standard, reversal was not warranted in this case given the lack of record evidence that any juror, let alone the juror whom defendant had hoped to excuse, harbored any bias against defendant. Justice ZAHRA would have affirmed the Court of Appeals judgment for these reasons.

Chief Justice MCCORMACK, joined by Justices BERNSTEIN and CAVANAGH, writing for reversal, concurred with the lead opinion that the trial court clearly erred by denying defense counsel's request to exercise a peremptory challenge to remove Prospective Juror 5(a) but disagreed with the rest of the lead opinion's conclusions. Specifically, Chief Justice MCCORMACK concluded that the trial court violated *Batson* by misapplying its three-part test and by accepting the prosecution's race-neutral reasons for excusing Prospective Juror 2(a), which were not supported by the record. She also disagreed with the lead opinion's conclusion that the error of refusing to remove Prospective Juror 5(a) was subject to harmless-error review, stating that such a rule effectively would lead to automatic affirmance. Because a *Batson* violation requires automatic reversal, she would have reversed the Court of Appeals judgment and remanded for a new trial.

Justice WELCH did not participate in the disposition of this case because the Court considered it before she assumed office.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED May 20, 2021

S T A T E  O F  M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                        No. 159346

JACQUES JEAN KABONGO,

     Defendant-Appellant.

BEFORE THE ENTIRE BENCH (except WELCH, J.)

ZAHRA, J. (*for affirmance*).

In this case, we granted leave to appeal to address the trial court's resolution of a pair of *Batson*[1] challenges, each concerning the others' use of peremptory challenges to remove prospective jurors on the basis of race. The prosecution first exercised its statutory right to remove a white prospective juror from the panel, and then exercised the same right

---

[1] *Batson v Kentucky*, 476 US 79; 106 Ct 1712; 90 L Ed 2d 69 (1986).

to consecutively remove three black prospective jurors from the panel.[2]  At this point, defendant asserted a *Batson* challenge to the prosecution's removal of the three black prospective jurors.  The trial court rejected this challenge.  We conclude that the trial court did not clearly err by finding that the prosecution's race-neutral explanation was not a pretext for improper purposeful discrimination.  The record evidence before us is open to interpretation regarding defendant's *Batson* challenge.  Though some trial courts may have reached a different conclusion, our deferential review of the trial court's decision in this case does not leave us with a definite and firm conviction that the trial court erred.

The second *Batson* challenge at issue was raised by the prosecution upon the exercise of defendant's third peremptory challenge.  The prosecution noted that all the peremptory challenges asserted by defendant excused white prospective jurors.  Defendant explained that his most recent peremptory challenge was directed toward a prospective juror with extensive familial ties to law enforcement.  The trial court sustained the prosecution's *Batson* challenge, leaving on the prospective jury panel a prospective juror whom defendant preferred to remove.  We conclude that the trial court clearly erred by determining that defense counsel's race-neutral explanation was a pretext to discrimination such that defense counsel engaged in purposeful discrimination by exercising a peremptory

---

[2] Ordinarily, jury selection involves a group of citizens in the community randomly summoned to the courthouse on a particular day for potential jury service, often referred to the "jury pool."  Then, a subgroup of these citizens are called into a courtroom, and this subgroup is known as the jury venire.  From this venire, prospective jurors are drawn to a panel of 14 that constitutes a prospective jury.  In this opinion, we describe these prospective jurors as Prospective Juror(s) 1 through 14(a).  Replacements to any of these prospective jurors drawn from the venire are described as Prospective Jurors 1 through 14(b), and so on.

challenge of this prospective juror. While defense counsel's comments may have suggested that he was previously engaged in purposeful discrimination against white prospective jurors during voir dire and that defense counsel perhaps even intimated an intent to continue to do so, the record does not reflect that defense counsel actually engaged in purposeful discrimination against this particular prospective white juror. This prospective juror had extensive familial ties to law enforcement, and the sole evidence against defendant was to be the testimony of law enforcement officers.

Having concluded that the trial court clearly erred by granting the prosecution's *Batson* challenge, we must determine whether the court's denial of defendant's peremptory challenge is a structural error under Michigan law requiring automatic reversal, or whether the error is subject to harmless-error review. A trial court's erroneous denial of a defendant's peremptory challenge is not a constitutional error, let alone a structural error requiring automatic reversal, under the federal Constitution. The Supreme Court of the United States has repeatedly recognized that states need not even provide peremptory challenges. The Sixth Amendment guarantees a right to an "impartial jury," not a right to the jury of one's choosing. The Court has explained that if a state does provide peremptory challenges, then the state is free to decide, as a matter of state law, the remedy available for a trial court's mistaken denial of a peremptory challenge.[3] Michigan law provides no basis for a rule that would require automatic reversal when a trial court denies a peremptory challenge on the basis of an improperly granted *Batson* challenge or otherwise. Rather, Michigan law generally views peremptory challenges as a nonconstitutional right that is

---

[3] *Rivera v Illinois*, 556 US 148, 152; 129 S Ct 1446; 173 L Ed 2d 320 (2009).

provided to both parties as one of the many optional *means* to secure the constitutional guarantee of an impartial jury. For reasons more fully discussed below, we conclude that a trial court's erroneous denial of a defendant's peremptory challenge is not a structural error that requires automatic reversal under Michigan law. Instead, the trial court's error is subject to harmless-error review.

Applying harmless-error review, we conclude that reversal is not warranted in this case. There is no record evidence that the trial court's denial of defendant's peremptory challenge resulted in a miscarriage of justice. There is no evidence that any juror, let alone the juror whom defendant hoped to excuse, harbored any bias against defendant. Because defendant received a trial from an impartial jury, no harm resulted from the trial court's erroneous denial of defendant's peremptory challenge. We would therefore affirm the Court of Appeals' judgment holding that defendant is not entitled to a new trial.

## I. BASIC FACTS AND PROCEEDINGS

On October 15, 2016, defendant was working on a rental property he owned on Monte Vista Avenue in Detroit. Two Detroit police officers, Royer Hernandez and Alexander Collrin, saw defendant openly carrying a holstered handgun outside the house as they drove by on patrol. Officer Hernandez looked in his rearview mirror as he passed and saw defendant walk to the rear door on the driver's side of a pickup truck parked in the street. Officer Hernandez testified that while defendant appeared to be taking tools from the back seat of the truck, he covered the gun with a blue shirt he was wearing. Officer Collrin also saw defendant conceal the weapon. The officers returned to the property to ask defendant if he had a concealed pistol license (CPL). Defendant produced an expired

4

CPL. The officers immediately arrested defendant for unlawfully carrying a concealed weapon, a felony.

After a somewhat contentious jury-selection process, defendant was tried and convicted on the sole count of carrying a concealed weapon. The trial court later sentenced him to nonreporting probation for one year and 50 hours' community service. Defendant appealed by right. The Court of Appeals affirmed in an unpublished per curiam opinion.[4] Defendant sought leave to appeal in this Court, and we granted the application with respect to the following issues:

> (1) whether the prosecution's exercise of a peremptory challenge against prospective juror no. 2 violated *Batson v Kentucky*, 476 US 79 (1986); (2) whether the trial court erroneously precluded the defendant from exercising a peremptory challenge against prospective juror no. 5; (3) if so, whether such an error should be subject to automatic reversal or harmless error review . . . ; and (4) if so, whether reversal is warranted in this case.[5]

## II. ANALYSIS

### A. *BATSON* CHALLENGES

The Fourteenth Amendment of the United States Constitution provides that no state shall deny "any person within its jurisdiction the equal protection of the laws."[6] The

---

[4] *People v Kabongo*, unpublished per curiam opinion of the Court of Appeals, issued December 27, 2018 (Docket No. 338733). Defendant's motion for reconsideration was denied on February 20, 2019.

[5] *People v Kabongo*, 505 Mich 999 (2020).

[6] US Const, Am XIV. Two decades before *Batson*, the United States Supreme Court held that, under the Equal Protection Clause of the Fourteenth Amendment, a party may not remove a prospective juror solely on the basis of a person's race. *Swain v Alabama*, 380 US 202, 203-204; 85 S Ct 824; 13 L Ed 2d 759 (1965), overruled in part by *Batson*, 476 US 79. As we explained in *People v Knight*, 473 Mich 324, 336 n 9; 701 NW2d 715 (2005), the Court in *Batson*, 476 US at 92-93, eliminated the requirement in *Swain*, 380

5

Michigan Constitution provides the same protection.[7] In *Batson*, the Supreme Court of the Unites States held that a "State's privilege to strike individual jurors through peremptory challenges is subject to the commands of the Equal Protection Clause."[8] Specifically, the Supreme Court held:

> Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.[9]

To assist courts in resolving *Batson* challenges, the Supreme Court implemented a three-part burden-shifting analysis to be used in resolving *Batson* challenges. The process starts with the assertion of a challenge under *Batson*. The party bringing the *Batson* challenge must first "make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."[10]

---

US at 223-224, that the defendant must show that the prosecution had a practice or pattern of using peremptory challenges in other cases.

[7] Const 1963, art 1, § 2 provides:

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

[8] *Batson*, 476 US at 89 (comma omitted).

[9] *Id.* (quotation marks and citation omitted).

[10] *Id.* at 93-94.

Upon an initial showing of a prima facie case of purposeful discrimination, the burden then shifts to the proponent of the peremptory challenge " 'to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strike[]."[11] Once the proponent of the peremptory challenge articulates a race-neutral explanation, the trial court must determine whether it was more likely than not that the challenge was improperly motivated;[12] that is, whether the proponent's "race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination."[13]

Moreover, while the facts of *Batson* were limited to a criminal defendant's challenge to the prosecution's use of a peremptory challenge to remove a juror on the basis of race, the United States Supreme Court has also held that the prosecution may challenge a defendant's use of a peremptory challenge for the same reason. In *Georgia v McCollum*, the Supreme Court held that "the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory

---

[11] *Johnson v California*, 545 US 162, 168; 125 S Ct 2410; 162 L Ed 2d 129 (2005), quoting *Batson*, 476 US at 94.

[12] *Johnson*, 545 US at 170 ("[I]n describing the burden-shifting framework, we assumed in *Batson* that the trial judge would have the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated.").

[13] *Knight*, 473 Mich at 338, citing *Batson*, 476 US at 98. Also, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v New York*, 500 US 352, 359; 111 S Ct 1859; 114 L Ed 2d 395 (1991).

7

challenges."[14]  Notably, the same framework from *Batson* applies to cases in which the prosecution opposes a defendant's use of a peremptory challenge on the basis of racial discrimination.[15]

### 1. A PRIMA FACIE CASE OF PURPOSEFUL DISCRIMINATION

To establish a prima facie case of purposeful discrimination in the exercise of a peremptory challenge, the opponent of the challenge must show: (1) the defendant is a member of a cognizable racial group; (2) the exercise of a peremptory challenge to exclude a member of a certain racial group from the jury pool; and (3) circumstantial evidence that raises an inference that the peremptory challenge was exercised on the basis of race.[16]

Courts have described what evidence may be useful in showing the "inference" of purposeful discrimination.  Often, those bringing a *Batson* challenge have relied solely on a "numbers" argument (i.e., how many times the opposing party has struck members of a particular race).  As noted in several federal circuit courts of appeals, the use of numbers alone generally does not establish a prima facie case.  The United States Court of Appeals for the First Circuit has stated that, while the particular number of challenges exercised

---

[14] *Georgia v McCollum*, 505 US 42, 59; 112 S Ct 2348; 120 L Ed 2d 33 (1992).  The Court explained that the constitutionally significant harm related to this error concerned jurors and the justice system more than a defendant's exercise of a discriminatory peremptory challenge.  *Id*. at 49-50.

[15] *Id*. at 59 ("Accordingly, if the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges.").  Because *McCollum* held that *Batson* applies to a defendant's peremptory challenges, the prosecution in this case was permitted to challenge defendant's peremptory challenges of white jurors.

[16] *Knight*, 473 Mich at 336, citing *Batson*, 476 US at 96.

8

against a particular class of people is relevant, "a party who advances a *Batson* argument ordinarily should come forward with facts, not just numbers alone."[17]  The court explained that "[r]elevant numeric evidence includes the percentage of strikes directed against members of a particular group,"[18] "the percentage of a particular group removed from the venire by the challenged strikes,"[19] and "a comparison of the percentage of a group's representation in the venire to its representation on the jury."[20]

Relevant nonnumeric evidence may also include "a pattern of strikes against members of the racial group, as well as the types of questions the prosecutor asks in his voir dire examination."[21]  Other relevant nonnumeric evidence is whether similarly situated jurors from outside the allegedly targeted group were permitted to serve.[22]

These factors give effect to *Batson*'s statement that a " 'pattern' of strikes . . . might give rise to an inference of discrimination."[23]  We therefore conclude that when a party

---

[17] *Aspen v Bissonnette*, 480 F3d 571, 577 (CA 1, 2007) (quotation marks and citation omitted).

[18] *Id.*, citing *Paulino v Castro*, 371 F3d 1083, 1091 (CA 9, 2014).

[19] *Aspen*, 480 F3d at 577, citing *Turner v Marshall*, 63 F3d 807, 813 (CA 9, 1995), overruled on other grounds by *Tolbert v Page*, 182 F3d 677, 684 (CA 9, 1999).

[20] *Aspen*, 480 F3d at 577, citing *United States v Sangineto-Miranda*, 859 F2d 1501, 1521-1522 (CA 6, 1988).

[21] *McCain v Gramley*, 96 F3d 288, 290 (CA 7, 1996).

[22] *Boyd v Newland*, 467 F3d 1139, 1148-1150 (CA 9, 2006).

[23] *Batson*, 476 US at 97.  Of course, we acknowledge that "statistical evidence about the prosecutor's use of peremptory strikes" is relevant evidence of a prima facie case. *Flowers v Mississippi*, 588 US ___, ___; 139 S Ct 2228, 2243; 204 L Ed 2d 638 (2019).  Nothing in our conclusion would diminish a party's ability to raise this statistical evidence.  We would simply conclude that a party must use this evidence to argue a pattern of

raises a "numbers" argument in a *Batson* challenge, those numbers, by themselves, are insufficient to establish a prima facie case. In sum, a prima facie case of discrimination under *Batson* should be premised on facts over and above the *number* of individuals excused. The number of jurors excused (or not excused) is important only to the extent that it demonstrates a *pattern* of discrimination.

## 2. OFFERING A NEUTRAL EXPLANATION IN SUPPORT OF THE PEREMPTORY CHALLENGE

If the trial court is satisfied that a prima facie showing of discrimination has been made, the burden shifts to the party exercising the peremptory challenge to come forward with a neutral explanation" to support the challenge.[24] This second step "does not demand an explanation that is persuasive, or even plausible."[25] The issue is the " 'facial validity of the . . . explanation. Unless a discriminatory intent is inherent in the . . . explanation, the reason offered will be deemed race neutral.' "[26] While the explanation "need not rise to the level justifying exercise of a challenge for cause," the proponent of the peremptory challenge must do more than state that the challenged juror would be biased because of race.[27]

---

discrimination. See *id*. at ___; 139 S Ct at 2246 (analyzing the statistical evidence in light of *Batson*'s endorsement to show a "pattern" of discrimination).

[24] *Batson*, 476 US at 97.

[25] *Purkett v Elem*, 514 US 765, 768; 115 S Ct 1769; 131 L Ed 2d 834 (1995).

[26] *Id*., quoting *Hernandez*, 500 US at 360.

[27] *Batson*, 476 US at 97.

10

## 3. RESOLVING A *BATSON* CHALLENGE

If the proponent of the peremptory challenge provides a race-neutral explanation, the trial court must determine whether this explanation is a pretext to improper discrimination and whether the opponent of the challenge has proved purposeful discrimination.[28] This third step "requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it."[29] The "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."[30]

*Batson* cautions that a trial court's "findings in the context under consideration here largely will turn on evaluation of credibility," and thus "a reviewing court ordinarily should give those findings great deference."[31] This directive was subsequently reaffirmed in *Hernandez v New York*, in which the Supreme Court noted that this deference "makes particular sense in th[e] context" of the third *Batson* step because of the importance of credibility.[32] "In the typical peremptory-challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge."[33] An evaluation of the

---

[28] *Knight*, 473 Mich at 337-338, citing *Batson*, 476 US at 98.

[29] *Miller-El v Dretke*, 545 US 231, 252; 125 S Ct 2317; 162 L Ed 2d 196 (2005).

[30] *Purkett*, 514 US at 768.

[31] *Batson*, 476 US at 98 n 21.

[32] *Hernandez*, 500 US at 365.

[33] *Id*.

attorney's state of mind, demeanor, and credibility lies "peculiarly within [the] trial judge's province."[34] Likewise, the trial court must also evaluate "whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror . . . ."[35] This deference is necessary "because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations."[36] Consequently, "in the absence of exceptional circumstances," an appellate court should defer to the trial court's determination in this regard.[37]

## B. APPLICABLE STANDARDS OF REVIEW

The proper standard of review for a *Batson* challenge depends on which of the *Batson* steps the Court is reviewing:

> If the first step is at issue (whether the opponent of the challenge has satisfied his burden of demonstrating a prima facie case of discrimination), we review the trial court's underlying factual findings for clear error, and we review questions of law de novo. If *Batson*'s second step is implicated (whether the proponent of the peremptory challenge articulates a race-neutral explanation as a matter of law), we review the proffered explanation de novo. Finally, if the third step is at issue (the trial court's determinations whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination), we review the trial court's ruling for clear error.[38]

---

[34] *Id*. (quotation marks and citation omitted).

[35] *Snyder v Louisiana*, 552 US 472, 477; 128 S Ct 1203; 170 L Ed 2d 175 (2008).

[36] *Miller-El v Cockrell*, 537 US 322, 339; 123 S Ct 1029; 154 L Ed 2d 931 (2003).

[37] *Snyder*, 552 US at 477 (quotation marks and citation omitted).

[38] *Knight*, 473 Mich at 345.

"Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake."[39]

## C.  REVIEW OF VOIR DIRE PROCEEDINGS

The trial court began voir dire by questioning each of the initial 14 prospective jurors on the panel randomly selected from the venire to ensure that each was qualified and competent to serve as a juror.  The court then turned voir dire questioning over to the parties.  After the parties had questioned the prospective jurors and passed on challenges for cause, the prosecution exercised two peremptory challenges and removed Prospective Juror 3(a), who was black, and Prospective Juror 13(a), who was white.  Next, defense counsel was offered an opportunity to exercise peremptory challenges but declined to do so.  The trial court questioned the replacement venire jurors, found Prospective Jurors 3(b) and 13(b) qualified and competent, and allowed the parties to question the new prospective jurors.  The parties passed again on challenges for cause.  Thereafter, defense counsel exercised a peremptory challenge and removed Prospective Juror 11(a), who was white.  The prosecution then exercised a third peremptory challenge and removed Prospective Juror 2(a), who was black.[40]

---

[39] *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011).

[40] The court on its own removed for cause the replacement Prospective Juror 11(b) because he answered "no" to the question whether he could "listen to the evidence that's presented and base [his] verdict on the evidence[.]"  Specifically, Prospective Juror 11(b) claimed he had previously been

> arrested and the officer made statements in the report which were false.  My attorney brought this up with the prosecutor.  The prosecutor had this officer brought up in front of the judge to discuss but beyond that I don't recall or I don't know but . . . I pled guilty.

13

A replacement was chosen for Juror 2(a), and the court repeated its voir dire process. The prosecution then exercised its fourth peremptory challenge and removed Prospective Juror 14(a), who was black. Juror 14(b) was removed for cause[41] and replaced by Juror 14(c).[42] At this point, the court sent the venire and the 13 prospective jurors seated in the jury box to lunch.

After the venire and prospective jurors had left the courtroom, defense counsel raised the following concern regarding the prosecution's use of its peremptory challenges:

> [*Defense Counsel*]: The prosecution has excused four people and I can't—I can't recall whether or not the fourth person was an African American but three of them were. And I believe that this Court needs to at least attempt to get a definitive answer from the prosecutor about dismissing at least three, and I'm not sure of myself, the four people that she has excused . . . .

> *The Court*: The fourth was juror number 13[(a)] and that was a Caucasian person.

> [*Defense Counsel*]: Yes.

> *The Court*: And, currently, our jury panel has one, two, three, African Americans.

---

Neither party objected to the removal of Prospective Juror 11(b) for cause, nor did either party challenge for cause Prospective Juror 11(c).

[41] The court excused Prospective Juror 14(b) after he gave varying answers regarding whether he would be able to return a guilty verdict because of his religious beliefs.

[42] Defense counsel challenged Prospective Juror 14(c) for cause because she stated, "I just don't think people should be visibly displaying guns [regardless] whether they're legally car[ry]ing unless they're in a safety position[.]" When pressed, however, Prospective Juror 14(c) asserted that while it was her "feeling" that people should not visibly be carrying guns, she would "uphold the law so I'll set [my personal views] aside." The court denied defendant's challenge for cause, and defense counsel exercised a peremptory challenge to remove Prospective Juror 14(c).

The prosecution offered justifications for each of its peremptory challenges of black jurors. In regard to Prospective Juror 3(a), the prosecution cited several examples in which the juror showed a lack of interest in serving on a jury, stating:

> As it relates to juror number three who I believe was the first juror that I struck, Ms. Whitford. She clearly did not want to be here. She was refusing to make eye contact with myself asking her questions, she was sitting down rolling her eyes, she had her arms crossed [at] a number of points. When the Court asked about real hardships it was my job, it was my kids. The Court asked about medical reasons, oh, I have arthritis. And then also she said she had a torn ligament in her leg and she said it made it difficult for her to sit stand [sic] and then she said she had a broken—and then didn't even tell us what the broken part of her body was. And the People would like jurors that—I know everyone doesn't necessarily want to be here, it's not their favorite thing, but people that are going to be attentive jurors. And based on her body language and her lack of interaction with me when I was trying to interact with her as well as the multitude of excuses she gave[,] that is the reason that the People excused her.[43]

---

[43] In response, defense counsel argued:

> That's the usual responses about the lack of contact, and she didn't look at me, and her body language, and she really didn't want to be here. She didn't tell us what part of her body was ever broken as if, I don't know what that means, but that somehow is further justification so to speak. I just don't believe we've heard anything other than the usual excuses that cover up a use of a peremptory for racial reasons.

The trial court permitted the prosecution's use of a peremptory challenge to Juror 3(a), ruling:

> [T]he prosecution provided several reasons, and I would concur with her, because the first question out the box with juror number [3(a)] was is a one to two day trial a genuine hardship and she was the first person to raise her hand. She then did sit with her arms crossed. I did notice the eyes rolling. She proffered her reasons for not wanting to be on the jury; her job, her children, and physical condition.

15

In regard to Prospective Juror 14(a), the prosecution noted she was pregnant and having trouble paying attention because she did not feel well, explaining:

> With regard to juror 14[(a)], Ms. Reynolds, it's not on record but Ms. Reynolds was clearly quite pregnant. She indicated that she had gone to the doctor the day before for severe pain. As she's sitting in the jury seat her head was in her hand and she also just appeared to be in extreme pain. It did not appear to the People that she was going to be necessarily inattentive or trying to off the jury [sic] but based on her quite extreme pregnancy and the fact that she said she was having sever [sic] pains the day before the People had a concern both with her being able to sit through today as well as possibly losing her over the weekend if she has to keep going back to the doctor. But, again, the head in her hands, her eyes are closing and she's clearly in distress. The People excused juror number 14[(a)].[44]

In regard to the prosecution's peremptory challenge as to Prospective Juror 2(a), one of two peremptory challenges this Court expressly granted leave to address, the

---

> So I'm going to find that there has been a reason offered that is not inherently discriminatory.

[44] In response, defense counsel argued:

> Yeah. I mean, there' [sic] was one juror sitting there, juror number eight, who was taking a quick snooze. I mean, the point being that other than the fact that she was pregnant there was absolutely nothing whatsoever—and that didn't disable her in anyway, you don't become disabled, generally speaking, by being pregnant. I can't speak, I'm a guy. But that's no basis to excuse somebody because they're pregnant. And other than that there wasn't anything that this witness exhibited that wasn't exhibited by other jurors as well.

The trial court ruled, under the third *Batson* step:

> [T]here is a race neutral explanation for the peremptory challenge. This lady is pregnant, she did have her head in her hand, she testified to having a doctor's appointment, she was clearly not feeling well. She testified she has flexible work hours, she has children at home, she [was] depend[e]nt upon her mother for childcare assistance.

prosecution cited concerns with the juror's memory as the basis for its challenge, explaining:

> With regards to juror number two she had what seemed, at least to me, to be a very difficult time with short-term memory. She could not remember the Court's first question when asked what her occupation was, and she couldn't remember any of the additional questions after that. She had to ask a few times. Also, she indicated having a senior moment here and there. She indicated, when asked about contact with the police, she thought she had been pulled over or she thought she had contact with the police before. She couldn't remember any sort [of] specifics. Same with whether herself or her family were a victim of the crime she thought, yes, maybe robberies or armed robbery or something, I can't remember, I can't remember, I don't remember how long ago, I don't remember anything. So she had a problem with memory and it's the People's concern for her that if we're going to hear testimony today and then have a long weekend and come back on Monday. And, so, the likelihood that she would forget testimony seemed fairly probable and the People were concerned about that.

In response, defense counsel disputed the veracity of the prosecutor's assertions, stating:

> There's absolutely no validity to what was just stated. That witness indicated only a difficulty in remembering whether something happened 10 years ago. And if the Court wants us to review anything I'm sure the court reporter could do so if the Court wished the exact word back and forth. Just repeating memory, memory, by the prosecutor is not reflective of what that p[ro]spective juror indicated. There was no memory problem whatsoever.

The trial court rejected defendant's *Batson* challenge, beginning its analysis at *Batson*'s second step:

> [S]tep two of the *Batson* framework is that the prosecutor must articulate a neutral explanation related to the particular case to be tried. . . . [T]he Court is only concerned with whether the proffered reasons violate[] the Equal Protection Clause and that's, again, part of the *Batson* case.
>
> I'm going to find in this case that the prosecutor as to juror number two has offered a race neutral explanation for the peremptory challenge and further has articulated a neutral explanation for the dismissal. Juror number

17

two did indeed have a difficult time with memory[;] she did discuss senior moments. She had to kind of . . . step back and reach back in her memory to recall things such as whether or not she had been the victim of a crime, such as—there were some other specific ones. But I do remember she did seem to have a problem keeping up with this case.

And *Batson*'s second step does not require[] articulation of [a] persuasive reason or even a plausible one[;] so long as the reason is not inherently discriminatory[,] it suffices. . . .

So here the prosecutor has provided a race neutral explanation for her peremptory challenges to number two so I'm going to then deny the *Batson* challenge as to juror number two.

\* \* \*

. . . [T]he third step [of the *Batson* analysis] . . . requires that the trial [c]ourt make a final determination of whether the challenger of the strike, which would be the defense, has established purposeful discrimination. And whether there is purposeful discrimination is the persuasiveness of the prosecutor's justification for the peremptory strike. It comes down to whether the trial [c]ourt finds the prosecutor's race neutral explanations to be creditable [sic]. And in this case I will find that it was reasonable, her explanation is not improbable, there was a rationale that had some basis in accepted trial strategy. And so I'm going to deny the *Batson* challenge as to juror number two.[45]  [Italics added.]

After the lunch break, jury selection continued by seating a prospective juror to replace Prospective Juror 14(c), who was excused for cause. After voir dire by the trial

---

[45] Almost immediately after the trial court denied defense counsel's *Batson* challenges, the prosecution stated:

With regard to *Batson*, your Honor, I just, for the record the, two jurors that defense counsel have excused have both been Caucasian I did make note of that. I am not raising [a] *Batson* challenge at this time I just want the Court to be on notice that is a potential issue coming up.

Defense counsel retorted, "Well, in terms of potential issue[s] let's see how many more black people the prosecutor excuses." The trial court admonished defendant, stating, "[W]e don't need that. That was an unnecessary remark."

18

court, the parties passed on any challenges for cause. After consulting with his client, defense counsel exercised a peremptory challenge to remove Prospective Juror 5(a)—counsel's third consecutive peremptory challenge of a white prospective juror and the other peremptory challenge this Court expressly granted leave to address. The prosecution immediately objected, and the trial court excused the jury pool and prospective jurors from the courtroom to review the prosecution's objection. The following discussion took place:

> [*The Prosecutor*]: Your Honor, the People are concerned that the defense has excused three jurors, they are all Caucasian, and based on, especially, the third challenge . . . , the People didn't see any reason the defense would want to excuse her and are asking for a race neutral reason for excusing all three of the white jurors[.]

> *The Court*: Well, let's start with juror number five because jurors numbers 11 and 14 were excused a while ago.

> [*The Prosecutor*]: They were.

> *The Court*: So let's talk about juror number five. Mr. Halpern?

> [*Defense Counsel*]: Juror number five's father is or was a police officer. Juror number five indicated that she had a felony conviction, although apparently nothing seemed to showup, but I would think the People know what they have a conviction of. There was real closeness—

> *The Court*: I'm sorry, Mr. Halpern, I can't hear you[.]

> [*Defense Counsel*]: Father and brother I think were somehow connected with law enforcement. And there were some personal feelings back and forth that I had when I was questioning her that . . . seemed to me to be negative.

> *The Court*: Such as what?

> [*Defense Counsel*]: Just my feelings, my feelings of exchange of words that I felt were unfriendly, somewhat antagonistic I felt. So all of those reasons.

> *The Court*: Ms. Posigian?

19

[*The Prosecutor*]: Your Honor, that juror, juror number five, ha[s] been on the panel, I think she was on the initial panel. And there are several people that have friends or family members that are in law enforcement. With regard to her felony conviction the officer-in-charge did run her name and her date of birth over the break that we had and she had no record.

*The Court*: And that was placed on the record, too, as I recall.

[*The Prosecutor*]: Yes. And feelings aren't anything that really had been articulated. The people are concerned that there's not a race neutral reason for excusing juror number five.

[*Defense Counsel*]: I've used the same reasons . . . that the prosecutor used in terms of exchange of feelings, and the looks of somebody, the responses that were made. And number five also didn't really recall things so maybe she has a real problem remembering—

*The Court*: I don't recall that at all, Mr. Halpern. We haven't spoken to juror number five since we had our first round of dismissals. Juror number five has been just sitting there.

[*Defense Counsel*]: Right. But my concern—

*The Court*: So I'm confused. I don't remember her saying she couldn't remember anything.

[*Defense Counsel*]: Yeah, she couldn't remember—First of all, the conviction was out of state so I don't know whether or not the officer was able to check—

At this point the court swore in the officer, who confirmed that Juror 5(a) did not have a criminal record. The court then asked:

*The Court*: So your objection to her criminal record—

[*Defense Counsel*]: Well, then, my position is that she's lying. If they didn't find it, and according to the officer, then she wasn't telling the truth and I certainly don't want my client to be judged by someone who isn't telling the truth either way.

The trial court sustained the prosecution's *Batson* challenge, reasoning:

20

[S]tep two is to articulate a neutral explanation related to the particular case to be tried. And in this particular case Mr. Halpern articulates the fact that she has police officers in her family. But during the voir dire of number five I did not hear any additional voir dire directed to her about her relationships with police officers. She testified clearly to me during the voir dire that her relationships would not affect her ability to be a fair and impartial juror and she understood that the testimony of a police officer is to be put to the same challenges of weight and credibility as that of any other witness.

As far as any—as far as the fact that she didn't have a conviction or couldn't remember a conviction I'd far rather a juror disclose that she thinks that she may have a conviction and we investigate it and find out that she doesn't rather than a juror lie and say I don't have one when in reality they do. I don't feel it's appropriate to kick juror number five because she raised a concern which the Court was able to address.

Finally, when we talk about evaluating the plausibility of a race neutral explanation for a strike in light of[] all the evidence with a bearing on it[,] this inquiry, according to the Tennielle [sic][46] case[,] necessarily includes careful consideration of relevant, direct, and circumstantial evidence of intent to discriminate. And, also, in this case I have asked the defense very specifically what problems they have with juror number five considering the fact she has been seated on this jury since the original 14 jurors were impanelled. What I'm hearing is feelings. There is—I have to—I'm charged as the judge . . . to probe more deeply when someone just talks about feelings. And there's not sufficient facts here. I'm not hearing about somebody that's sleeping, somebody nervous, preoccupied, angry, disrespectful or agitated. I'm just hearing about feelings. I'm tasked with engaging in a more penetrating analysis focus[]ing on ascertaining whether the proffered race neutral reason is pretext intended to mask a discrimination. Evaluation of the central question requires the Court to permit argument by the opposing counsel who bears the burden of persuading the Court that the—that there was purposeful discrimination here. This record lacks any objective indicia of concern—concerning the impartiality of juror number five or that she is otherwise unfit to serve as a juror in this case. So I'm going to find . . . that the reason offered is insufficient and I am going to find that the challenger has established purposeful discrimination. So I'm going to keep juror number five on the jury . . . .

---

[46] *People v Tennille*, 315 Mich App 51; 888 NW2d 278 (2016).

The venire jurors and prospective jurors then returned to the courtroom. Defense counsel exercised a peremptory challenge to Prospective Juror 8(a), who was of Middle Eastern descent. Following a lengthy voir dire, the trial court dismissed Prospective Juror 8(b) for cause.[47] A replacement juror, Prospective Juror 8(c), was chosen and subjected to voir dire. After the parties passed on challenges for cause on Prospective Juror 8(c) and passed on additional peremptory challenges, the jury was empaneled.

In sum, the prosecution exercised peremptory challenges to remove three black prospective jurors and one white prospective juror. Defense counsel exercised peremptory challenges to remove two white prospective jurors and was denied a third consecutive challenge to a white prospective juror, but later exercised a peremptory challenge to excuse one prospective juror of Middle Eastern descent. The jury that was empaneled had at least three black jurors.[48]

---

[47] At the end of the trial court's voir dire, the following was revealed by Prospective Juror 8(b):

> [*Defense Counsel*]: You wouldn't accept uncontradicted testimony of the two police officers that said they have a concealed weapon; wouldn't be enough for you?
>
> [*Prospective Juror 8(b)*]: No, I wouldn't.
>
> *The Court*: I think it's very clear juror number eight would not follow the law. He just simply would not follow the law no matter what I told him the law was. So as disappointed as I am and juror number eight['s] stated determination not to follow the law I'm going to dismiss him from the jury panel regretfully.

[48] Absent from the record is a demographic breakdown of the empaneled jury. We know, however, that at least three black jurors were on the jury before Prospective Juror 8(c) was empaneled. The record is silent as to the race of Prospective Juror 8(c).

## 1. *BATSON* CHALLENGE TO PROSPECTIVE JUROR 2(a)

With this background, we address defendant's *Batson* challenge to the removal Prospective Juror 2(a). Although the three-prong burden-shifting analysis from *Batson* requires defendant to first establish a prima facie case of discrimination based on race, we note that the trial court began its analysis with the second prong because the prosecution immediately offered a race-neutral explanation for the peremptory challenges. While we question whether defendant satisfied his initial burden of proving a prima facie case of racial discrimination, we will proceed as if he did.[49]

---

[49] The Prosecuting Attorneys Association of Michigan (PAAM), as amicus curiae, presents a cogent and credible argument that it is questionable whether defendant established a prima facie case of purposeful discrimination. Defense counsel's objection was based solely on the prosecution's exercise of three out of four peremptory challenges on prospective black jurors. Defense counsel only requested to "get a definitive answer from the prosecution" about those challenges.

In order to establish a prima facie case, defendant was required to show that he is a member of a cognizable racial group, that the prosecution challenged one or more members of that group, and "all the relevant circumstances raise an inference" that the challenges were made on the basis of race. *Knight*, 473 Mich at 336. The first two requirements are clearly met, and, as for the third, it is true that a numbers-based showing may be relevant to raising an inference that the challenges were based on race. See *Aspen*, 480 F3d at 577. However, defendant did not attempt to show that those numbers showed a pattern of discrimination by, for instance, highlighting the number of peremptory strikes against prospective jurors of one race in comparison to the remaining prospective jurors of that same race. See, e.g., *McCain*, 96 F3d at 290; *Walker*, 490 F3d at 1291. Here, at the point of the jury-selection process when the prosecution exercised its peremptory challenge on Juror 2(a), the prosecution had only excused one black prospective juror, Juror 3(a), and one white prospective juror, Juror 13(a). Thus, because the trial court commenced its review of the jury-selection proceedings at Step Two of the three-prong *Batson* analysis, we decline to consider whether defendant established a prima facie case. Nonetheless, we recognize there are cogent arguments to support the conclusion that defendant failed to satisfy his initial burden of proving a prima facie case of racial discrimination under the first prong of the *Batson* analysis.

Turning to the second step of the *Batson* analysis, the prosecution offered a race-neutral reason for removing Prospective Juror 2(a): short-term memory problems. This reason for requesting removal does not need to be persuasive or even plausible; as long as a discriminatory intent is not inherent in the explanation, it will be deemed race-neutral.[50] Here, the proffered explanation was certainly race-neutral. Memory problems do not give rise to any inherent discriminatory intent by themselves. Rather, they have been repeatedly held as constituting a valid, race-neutral reason for a peremptory challenge.[51] Therefore, the trial court did not err by ruling that the prosecution offered a race-neutral reason for dismissing Prospective Juror 2(a).

Turning to Step Three, we find no clear error in the trial court's rejection of defendant's *Batson* challenge. We are guided by the principle that a trial court's finding that no *Batson* violation occurred is entitled to "great deference."[52] Here, defendant challenged the prosecution's peremptory strike of three prospective jurors: 2(a), 3(a), and 14(a). Even viewing defendant's challenge to Prospective Juror 2(a) in isolation, the record supports the trial court's conclusion that Prospective Juror 2(a) did have some memory problems. When asked about her qualifications, she had no problem remembering that she was retired from counseling, divorced, and had a bachelor's degree in criminal justice administration. But when asked if she had served on a jury before, she replied that she had

---

[50] *Purkett*, 514 US at 768.

[51] See *People v Armstrong*, 6 Cal 5th 735, 774; 433 P3d 987 (2019); *State v Toliver*, 205 So 3d 948, 955; 2015-1959 (La App 1 Cir 9/19/16); *Woolf v State*, 220 So 3d 338, 372 (Ala Crim App, 2014).

[52] *Hernandez*, 500 US at 364, citing *Batson*, 476 US at 98 n 21.

24

"years and years ago but we didn't have to serve because the defendant pled or something and then we left." Further, when asked if she knew someone who had been a victim of a crime, she responded, "[y]eah, we have been—our family has been but it was a long time ago. I can't remember the years and stuff. Senior moment. I'm 64 so . . . ." When asked if she ever had a bad experience with a police officer, she responded, "I'm sure I have been pulled over and stuff like that before but I don't remember how long ago that was."

Although the evidence supporting the prosecution's nonracial reasons for removing Prospective Juror 2(a) is not as clear and decisive as the reasons offered in support of the removal of Prospective Jurors 3(a) and 14(a), we conclude the challenge to Juror 2(a) cannot be reviewed in isolation. Counsel's exercise of other peremptory challenges is relevant evidence in assessing whether counsel exercised a particular peremptory challenge with improper motives.[53] Reviewing the totality of the proceedings, we conclude the trial

---

[53] The evidence that the prosecution's proffered reasons were credible goes far beyond the specific evidence pertaining to Prospective Juror 2(a). Defendant's *Batson* challenge concerned challenges to two other prospective jurors: 3(a) and 14(a). In each instance, the prosecution's race-neutral reasons were found to be credible based on strong record evidence. In context, the most relevant challenge would be the prosecution's peremptory challenge to Prospective Juror 3(a), as that strike was the only peremptory challenge of a black juror exercised by the prosecution before the peremptory challenge to Prospective Juror 2(a).

In regard to Prospective Juror 3(a), the prosecution argued that she had medical reasons that made it difficult for her to sit for long periods of time and it was clear that she was antagonistic to participating in the trial. These arguments are race-neutral and, if supported by the record, credible. See *United States v Garrison*, 849 F2d 103, 106 (CA 4, 1988) ("A prosecutor is justified in striking jurors that he or she perceives to be inattentive or uninterested."). Here, the prosecution's arguments were supported by the record. When asked what hardship jury service would present, Prospective Juror 3(a) answered, "my job and get[ting] my kids to school." She agreed with the trial court that she had not sought any deferment or excuse on the basis of hardship. Immediately after, the trial court asked the prospective jurors whether they had any health problems that would make jury service

court did not clearly err by accepting the prosecution's nonracial reasons for excusing Prospective Juror 2(a) peremptorily. This record sufficiently supports the conclusion that, perhaps because of her age, Prospective Juror 2(a) had trouble remembering details. While she did not have trouble remembering some basic information such as her age, educational background, and career history, she was unable to remember certain events that occurred in her life, some of which were significant and were relevant to her candidacy as a juror. For example, she claimed that her family had been the victim of a robbery, perhaps even

difficult. Prospective Juror 3(a) alone responded, and said she had a "torn ligament" and "arthritis bad in my knee so I can't sit or stand at periods of time." Further, the record supports the prosecution's contention that Prospective Juror 3(a) appeared antagonistic to the prosecution. The trial court confirmed having seen Prospective Juror 3(a) sit with her arms crossed and roll her eyes during voir dire. She also admitted that her "cousin . . . went to jail for armed robbery" and that three years ago she was convicted of third-degree retail fraud, a misdemeanor. Accordingly, the prosecution's history of peremptory challenges before the peremptory challenge of Prospective Juror 2(a) revealed no suggestion of discrimination on the basis of race. See, e.g., *Flowers*, 588 US at ___; 139 S Ct at 2243 (noting that a prosecutor's history of peremptory strikes is relevant evidence).

In regard to Prospective Juror 14(a), the prosecution highlighted that she was pregnant and was in "extreme pain." Consequently, the prosecution was concerned with whether Prospective Juror 14(a) would make it through trial, especially given that trial was expected to continue the following week. Again, these are race-neutral reasons to excuse a juror. See *State v Bell*, 359 NC 1, 15; 603 SE2d 93 (2004) (holding that a concern that a juror would "suffer so much pain [from medical issues] that she would be unable to participate in the proceedings" was a "valid and race-neutral reason" to excuse the juror). They were also supported by the record. Prospective Juror 14(a) stated that she was having trouble sleeping and caring for her children and that she had recently gone to the doctor for pain that was still persisting. The trial court also observed that "[t]his lady is pregnant, she did have her head in her hand, she testified to having a doctor's appointment, [and] she was clearly not feeling well." Thus, similar to Prospective Juror 3(a), the prosecution's reasons for using a peremptory challenge as to Prospective Juror 14(a) in no way suggest racial discrimination. The prosecutor's reasons for excusing both challenged jurors were credible and clearly supported by the record. While this reasoning is not dispositive as to Prospective Juror 2(a), it suggests that the prosecution's use of its challenges throughout voir dire was not motivated by race.

an armed robbery—something most people would consider to be a very traumatic and memorable event. When asked if she or her family had been the victim of a crime, she offered within that response that she could not "remember the years and stuff." She was briefly interrupted but continued to answer, stating "[w]e have had, you know, robbery and stuff like that but it was, like, a long time ago nothing recent." When viewed in context, we conclude it was reasonable that the prosecution believed this exchange called for Prospective Juror 2(a) to provide a more detailed and robust answer, and the absence of such left an impression that Prospective Juror 2(a) was unable to recall any details of this crime.[54] Further, the trial court, in ruling on defendant's *Batson* challenge, referred to the fact that Prospective Juror 2(a) repeatedly needed to "reach back into her memory to recall things" and that she "did seem to have a problem keeping up with this case." Those references pertain directly to the trial court's assessment and evaluation of Prospective Juror 2(a)'s demeanor and courtroom presence—information that is permissible to consider, but impossible to assess from a cold reading of the transcript.[55]

---

[54] The opinion supporting reversal suggests the prosecution should have probed more deeply into whether Juror 2(a) could recall specific details of crimes committed against her and her family. We disagree. Litigation is an art, and counsel should be ever mindful that every action one takes leave an impression on the jurors. It was enough that Juror 2(a)'s responses during voir dire caused counsel to question whether she would be able to recall details of evidence presented at trial. It was not the duty of counsel to prove Juror 2(a) actually lacked capacity to serve. Such action could leave an unfavorable impression of the prosecution with the other jurors; e.g., probing more deeply into Juror 2(a)'s memory might have given the impression that the prosecution was picking on one of the older jurors. It bears repeating that the "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 US at 768.

[55] See *Hernandez*, 500 US at 365; *Cockrell*, 537 US at 341. Because the record shows that the trial court actually assessed the demeanor and relied on its personal observations of Juror 2(a) when it overruled defendant's *Batson* challenge, we strongly disagree with the

27

While the prosecutor inaccurately described the nature and extent of Prospective Juror 2(a)'s memory problems, those inaccuracies, by themselves, are not demonstrative of an underlying discriminatory motivation to dismiss Prospective Juror 2(a) on the basis of race. The prosecutor characterized Prospective Juror 2(a)'s memory issues as "short term," yet all of her proofs related to long-term memory issues. Further, the prosecutor mentioned that Prospective Juror 2(a) had multiple "senior moments," even though she actually only mentioned such a moment once. The prosecutor also argued that Prospective Juror 2(a) could not remember her level of education, but it is clear that she did. While these inaccuracies, by themselves, could be evidence of discrimination,[56] the prosecutor's reasons for exercising a peremptory challenge as to Prospective Juror 2(a), taken as a whole, support the trial court's finding that the prosecution did not operate with a discriminatory motive. As mentioned above, Prospective Juror 2(a)'s responses were not altogether responsive to the questions posed to her during voir dire, and it is not unreasonable that the trial court shared the prosecution's impression that she had memory problems. Further, the record does not contradict the prosecution's assessment that this prospective juror had trouble recalling the details of past events. At best, the record evidence is mixed with regard to the prosecution's motives in removing Prospective Juror 2(a). But when we are not left with a definite and firm conviction that the trial court made

proposition taken in the opinion to reverse: that we can ignore the deferential standard of review appellate courts have long given to trial court findings on the issue of discriminatory intent in the context of a *Batson* challenge.

[56] See *Miller-El*, 545 US at 244 (explaining that considerations applicable to this fact-finding process include statements by the prosecutor that "mischaracterized [the] testimony" regarding the excused prospective juror's views).

28

a mistake, a mixed record is insufficient to support a finding of clear error. That a reviewing court might have acted differently is not a basis on which to find clear error in the trial court.[57]

Here, the record clearly establishes that Prospective Juror 2(a) had difficulty recalling some of the topics discussed during voir dire and had trouble remembering basic details of life events, which was relevant to her ability to consider all the evidence presented in a criminal jury trial and render a verdict on defendant's guilt. The trial court observed the demeanor of Prospective Juror 2(a) during the selection process, as well as the demeanor of the prosecutor in challenging Prospective Juror 2(a). In light of these courtroom observations, the trial court found that the prosecutor's reason for peremptorily removing Prospective Juror 2(a) was credible. The evidence contrary to the trial court's findings does not rise to the level of an "exceptional circumstance" justifying an appellate court's departure from the "great deference" given to the trial court.[58] Consequently, we conclude that the trial court did not clearly err by rejecting defendant's *Batson* challenge as to Juror 2(a).

---

[57] Trial court proceedings often move at an expeditious and unscripted pace that can impose stress on counsel and the court. Nonetheless, trial courts are presumed to understand the nature of their acts and to carry out their duties with proper preparation and knowledge. *Bishop v Hartman*, 325 Mich 115, 125; 37 NW2d 885 (1949). This presumption cannot be maintained if appellate courts review such proceedings with an expectation of perfection, viewed with the benefit of 20/20 hindsight.

[58] *Snyder*, 552 US at 477; *Batson*, 476 US at 98 n 21.

29

## 2. *BATSON* CHALLENGE TO PROSPECTIVE JUROR 5(a)

As earlier explained, *Batson* also applies to a defendant's peremptory challenge of jurors, and, "if the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges."[59]

Once again, the trial court did not immediately address whether *Batson*'s first step was satisfied, turning instead to defendant's proffered race-neutral reason for the challenge to Prospective Juror 5(a). But, unlike the court's *Batson* analysis in regard to Prospective Juror 2(a), the court here later readdressed whether the prosecution established a prima facie case. The court concluded, "I think in this case the prosecution, as to juror number five, has established a prima facie case because this is the third peremptory challenge which the defendant has raised." Moreover, this aspect of the issue is reviewed de novo because whether the facts on which the prosecution's argument relies constitute a prima facie case is a question of law.[60] In other words, this Court need not give deference to either the trial court's conclusions or the Court of Appeals' conclusions in regard to our treatment of this issue. Thus, while the parties do not raise the issue, we address whether the prosecution established a prima facie case raising an inference of racial discrimination as to Prospective Juror 5(a). The prosecution's argument regarding Prospective Juror 5(a) was nearly as perfunctory as defendant's argument regarding Prospective Juror 2(a). The prosecution stated that "the defense has excused three jurors, they are all Caucasian, and based on,

---

[59] *McCollum*, 505 US at 59.

[60] *Knight*, 473 Mich at 342, 345.

especially, the third challenge[d] witness[']s reasons, the People didn't see any reason the defense would want to excuse her and are asking for a race neutral reason . . . ."

Like defendant's argument regarding Prospective Juror 2(a), the prosecution's argument was based on numbers alone, focusing only on the fact that defendant had excused three white jurors without placing those numbers in meaningful context. The trial court was persuaded by this argument, concluding that the prosecutor's citation of the numbers of peremptory challenges against white prospective jurors established a prima facie case.[61] But the prosecution did not attempt to translate these numbers into an argument that there was a pattern of racial discrimination. Again, it is a pattern, not just numbers, that can establish a prima facie case.[62]

Further, the crux of the prosecution's prima facie argument was not just that defendant had excused three white jurors, but rather that it did not "see any reason the defense would want to excuse her," referring to Juror 5(a). This statement does not raise any inference that defendant was engaging in purposeful discrimination. A party need not have a strong legal reason for excusing a particular juror.[63] Indeed, the concept of

---

[61] The record indeed shows that defendant exercised peremptory challenges only against three white jurors, and the number of peremptory challenges used against a particular racial group is somewhat relevant. See *Aspen*, 480 F3d at 577. But, given that white jurors made up a majority of the jury venire and prospective jurors, it is not surprising that defendant's challenges had only been directed toward white individuals.

[62] See, e.g., *McCain*, 96 F3d at 290; *Walker*, 490 F3d at 1291.

[63] See *Hayes v Missouri*, 120 US 68, 70; 7 S Ct 350; 30 L Ed 578 (1887) ("The public prosecutor may have the strongest reasons to distrust the character of a juror offered, from his habits and associations, and yet find it difficult to formulate and sustain a legal objection to him.").

31

peremptory challenges rests on the notion that one need not have *any* reason to dismiss a prospective juror. *Batson*'s only restriction on this otherwise unfettered right to strike prospective jurors is that one cannot be motivated by race.[64]

Thus, as with defendant's prima facie case regarding Prospective Juror 2(a), we again question whether a prima facie case was made, this time by the prosecution. The prosecution's reliance on the number of peremptory challenges to remove white jurors alone does not show any pattern of discrimination. Defendant's challenges were not against a minority ethnic group, so, presumably, there were plenty of white individuals left both on the prospective panel and in the venire. And the prosecution was not necessarily entitled to "ask for" a reason for the peremptory challenge. Even though no party has raised the argument that the prosecution's prima facie case failed, we would conclude that it did.

Even assuming that the prosecution did establish a prima facie case, we would also conclude that the trial court erred by sustaining the prosecution's *Batson* challenge. Moving to the second *Batson* step, defense counsel offered several race-neutral reasons for challenging Prospective Juror 5(a). Specifically, he stated that Juror 5(a) had family connections to law enforcement, that she purported to have a felony conviction that did not show up on her record, and that she appeared "antagonistic" and "unfriendly."[65] Each of these reasons is, on its face, valid and race-neutral. That family connections to law

---

[64] See *Batson*, 476 US at 85-86.

[65] Defense counsel did little to nothing to support his claim that Prospective Juror 5(a) was "antagonistic" and "unfriendly." In fact, his initial articulation suggested he was exercising this peremptory challenge on the basis of his gut feelings, something inherently suspect when reviewing a challenge under *Batson*. It was only in response to the trial court's questioning that defense counsel supplemented his argument to assert that this prospective juror was "antagonistic" and "unfriendly."

32

enforcement constitute a race-neutral reason to strike a juror is an unremarkable concept. Indeed, the parties themselves do not challenge the proposition. Accordingly, defendant's primary reason for striking Juror 5(a)—her familial connection to law enforcement—was a valid, nondiscriminatory reason to exercise a peremptory challenge. Additionally, striking an antagonistic or hostile juror is a race-neutral reason to exercise a peremptory challenge. The parties do not challenge that proposition, and we have no reason to disagree. Therefore, defendant proffered at least two race-neutral reasons for his challenge.

As with Prospective Juror 2(a), the ultimate question we must consider is whether the trial court's decision to sustain the *Batson* challenge was clearly erroneous, i.e., the third *Batson* step. Again, there must be an "exceptional circumstance" justifying an appellate court's departure from the "great deference" given to the trial court.[66] This is a very close and narrow question, but we ultimately conclude that the trial court clearly erred by upholding the prosecution's challenge. While the record does not significantly support the prosecution's argument that defendant was engaging in a pattern of racial discrimination by exercising a peremptory challenge on Prospective Juror 5(a), the record does reflect that the trial court was inclined to agree with the prosecution's earlier stated suspicions (following the denial of defendant's *Batson* challenge) that defense counsel had previously exercised peremptory challenges on Prospective Jurors 13(a) and 14(c) on the basis of race and that a peremptory challenge to *any* white juror by defendant should be viewed as highly suspect. Perhaps the trial court's disposition was justified given that when the prosecution initially stated its concern with defendant's use of peremptory

---

[66] *Snyder*, 552 US at 477; *Batson*, 476 US at 98 n 21.

challenges, defense counsel improvidently responded, "Well, in terms of potential issue[s] let's see how many more black people the prosecutor excuses." This remark did not go unnoticed by the trial judge, who admonished defense counsel for his unprofessionalism.

But a trial court cannot preclude the exercise of a peremptory challenge merely because the court suspects that a party has previously engaged in purposeful discrimination in the exercise of one or more peremptory challenges. Rather, each and every peremptory challenge must be weighed on its own merit.[67] In this case, defense counsel gave the court

---

[67] This Court has previously addressed a similar issue, albeit in a civil context. In *Pellegrino v Ampco Sys Parking*, 486 Mich 330, 334; 785 NW2d 45 (2010), the trial court expressed the "goal" that the jury composition would "represent[] the racial composition of [Wayne] county." The defendant attempted to peremptorily excuse a black woman, and the plaintiff raised a *Batson* objection. The trial court sustained the challenge, even though the defendant offered a valid race-neutral reason (she had recently been widowed and the facts of the case involved a widower). Despite the defendant's argument that the *Batson* issue was a red herring, the court commented that it would not "indulge in . . . race baiting . . . ." *Id.* at 335. This Court held that the trial court clearly erred by disallowing the peremptory challenge, explaining that denying a peremptory challenge in order to "attain a racially proportionate jury" violates the "rule of *Batson* that jurors must be indifferently chosen." *Id.* at 333 (quotation marks omitted). This Court further held that the trial court's actions violated the race-neutral requirements of both the state and federal Constitutions and MCR 2.511. The trial court's denial of the peremptory challenge expressly took the juror's race into account, leading this Court to state that it was "hard to conceive of a more flagrant and unambiguous violation of the court rule." *Id.* at 343. Further, the trial court's decision contravened caselaw from the United States Supreme Court, which holds that juries do not need to " 'mirror the community . . . .' " *Id.*, quoting *Taylor v Louisiana*, 419 US 522, 538 (1975). Moreover, this Court observed that the Constitution requires an impartial jury, not a representative one. *Id.* at 344, citing *Holland v Illinois*, 493 US 474, 480; 110 S Ct 803; 107 L Ed 2d 905 (1990).

The facts in this case are distinguishable from the facts in *Pellegrino*. Simply put, the trial court's actions in this case cannot be likened to the defiant and egregious actions of the trial court in *Pellegrino*. There, the trial court not only knowingly violated *Batson* and Michigan caselaw by actually influencing the racial composition of the jury, but in doing so, the court apparently sought to subvert all the relevant law to promote its own version of the "right" jury for a particular trial. Here, by contrast, it is very evident that the

every reason to closely scrutinize his use of peremptory challenges after defense counsel gratuitously intimated on the record that he would continue to peremptorily challenge white jurors as long as the prosecutor challenged black jurors. For this reason, we believe the trial court is aptly described by the following appraisal:

> [T]he trial judge's conduct reflected a good-faith, if arguably overzealous, effort to enforce the antidiscrimination requirements of our *Batson*-related precedents. To hold that a one-time, good-faith misapplication of *Batson* violates due process would likely discourage trial courts and prosecutors from policing a criminal defendant's discriminatory use of peremptory challenges. The Fourteenth Amendment does not compel such a tradeoff.[68]

But defense counsel's imprudent remark, standing alone, was not a sufficient reason for the court to find that defense counsel's third peremptory challenge of a white juror was racially motivated.

We are not persuaded that the prosecution's prima facie argument provided substantial, let alone strong or compelling, evidence that defendant had engaged in a pattern of striking members of a different racial group. The prosecution's argument, at most, revealed a *correlation* between defendant's challenges and racial discrimination. The record concerning Prospective Juror 5(a)'s peremptory challenge did not establish a purposeful discrimination on any improper basis, let alone race. Defense counsel's questioning of Juror 5(a) could have readily been the same as to any prospective juror, and it would have provided a legitimate excuse to exercise a statutorily provided peremptory challenge. Juror 5(a) stated that she had extensive ties to law enforcement, including "[m]y

---

trial court exercised a sincere and genuine effort to select the jury in conformity with the law established in *Batson*.

[68] *Rivera*, 556 US at 160.

father, my brother, stepmother all deputy sheriffs, and military police in my family, nephew and brother." She agreed to assess the police officer's testimony without assigning it greater weight than other witnesses' testimony, but defense counsel's wariness of her extensive ties to law enforcement (particularly in this case, which turns on the credibility of law enforcement officers' testimony) would reasonably lead defense counsel to exercise a preemptory challenge and excuse Juror 5(a) regardless of race. The prosecution points out that other prospective jurors had ties to law enforcement[69] and offers a few examples: one prospective juror had a brother who was a parole officer, another had a cousin who was a Wayne County Sheriff, and another had an uncle who was a police officer in Canton. While such comparisons may assist the trial court in determining whether a race-neutral reason in support of a peremptory challenge is a pretext for discrimination, the trial court here made no such finding with regard to Prospective Juror 5(a)'s ties to law enforcement.[70] Rather, the trial court merely concluded that it appeared this prospective juror could set aside these familial ties in assessing the credibility of police testimony. This is insufficient reason to deny the exercise of a peremptory challenge under *Batson*. *Batson* only requires

---

[69] See *Flowers*, 588 US at ___; 139 S Ct 2228 at 2243 (noting that a defendant may present other evidence showing that peremptory strikes were made on the basis of race, including "evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case" and "side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case").

[70] The record reflects these jurors' ties to law enforcement were not as extensive as the ties to law enforcement established by Prospective Juror 5(a). Strong familial ties to law enforcement alone may provide a valid reason for a peremptory challenge in response to a *Batson* claim.

36

the proponent of a peremptory challenge to articulate a race-neutral reason for exercising the challenge.[71]

We conclude that the trial court clearly erred by precluding defense counsel from peremptorily striking Prospective Juror 5(a). We do not arrive at this determination lightly. We acknowledge that the trial court is in the best position to consider not only the demeanor of the prospective juror, but also the "demeanor of the attorney who exercises the challenge."[72] But the record reflects that the trial court disregarded defendant's validly stated concerns relating to Juror 5(a)'s extensive ties to law enforcement. While Juror 5(a)

---

[71] The record also reflects that defense counsel asked Prospective Juror 5(a) about issues relating to race. Defense counsel asked her if she would be concerned about sitting on an all-black jury, and she responded: "I hope that I'm a person that looks beyond that. I work for [a school district in which] there's a lot of different culture." Defense counsel interjected "I hope," suggesting that Prospective Juror 5(a) might have reservations about her ability to set aside matters relating to race. But she clarified and stated, "I enjoy meeting other cultures and working with people getting to know people. I hope I don't look at people's skin color. I don't believe I do. It's their actions." This exchange between Prospective Juror 5(a) and defense counsel, while not antagonistic, may have nonetheless left defense counsel with a concern that Prospective Juror 5(a) would be antagonistic to defendant's case, such that a peremptory challenge of her would be in order.

Instead of accepting defense counsel's concerns about Juror 5(a)'s potential antagonism, the trial court took a highly skeptical view of the challenge, stating, "I'm not hearing about somebody that's sleeping, somebody nervous, preoccupied, angry, disrespectful or agitated. I'm just hearing about feelings." Further, the court dismissed defendant's argument that Prospective Juror 5(a) had a prior conviction because the officer in charge testified that she had no record. But defense counsel's concern that a prospective juror would claim to have a criminal record only to discover during jury service that the juror had no criminal record is not unreasonable. Frankly, had the prosecution proffered this reason to peremptorily challenge a prospective juror, it likely would have gone unnoticed, as it would have called into question whether the juror appreciated the gravity of the matter yet to be decided.

[72] *Hernandez*, 500 US at 365.

did say she could be impartial, nothing from *Batson* or its progeny informs us that a trial court can use this expression of impartiality to overcome the race-neutral concerns expressed by defense counsel.

In sum, the prosecution's prima facie case was weak. It did not offer evidence or an argument that showed a pattern of discrimination, and defendant offered valid race-neutral reasons that were supported by the record. The trial court disregarded those reasons because of one imprudent remark that, standing alone, was insufficient for the court to find a racial motivation. While the trial court's findings are entitled to great deference, we conclude that, in this instance, the court clearly erred by sustaining the prosecution's *Batson* challenge as to Prospective Juror 5(a).

## D. REMEDY

A plurality of this Court, in *People v Bell*, "recogniz[ed] the distinction between a *Batson* error and a denial of a peremptory challenge."[73] Namely, "[a] *Batson* error occurs when a juror is actually dismissed on the basis of race or gender."[74] "In contrast, a denial of a peremptory challenge on other grounds amounts to the denial of a statutory or court-rule-based right to exclude a certain number of jurors."[75] The *Bell* plurality concluded that "[a]n improper denial of such a peremptory challenge is not of constitutional dimension."[76]

---

[73] *People v Bell*, 473 Mich 275, 293; 702 NW2d 128 (2005), amended 474 Mich 1201 (2005).

[74] *Id.*

[75] *Id.*

[76] *Id.*

A few years later, the United States Supreme Court granted the petition for writ of certiorari in *Rivera v Illinois*[77] "to resolve an apparent conflict among state high courts over whether the erroneous denial of a peremptory challenge requires automatic reversal of a defendant's conviction as a matter of federal law."[78] The Supreme Court cited this Court's plurality opinion in *Bell* and identified it as one of those "rejecting [the] automatic reversal rule and looking to state law to determine the consequences of an erroneous denial of a peremptory challenge[.]"[79] Ultimately, the *Rivera* Court, in an opinion issued by a unanimous Court, agreed with the plurality in *Bell* and stated:

> Absent a federal constitutional violation, States retain the prerogative to decide whether such errors deprive a [jury] of its lawful authority and thus require automatic reversal. States are free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se*."[80]

In reaching this holding, *Rivera* first iterated that "[t]his Court has 'long recognized' that 'peremptory challenges are not of federal constitutional dimension.' "[81] Indeed, "[s]tates may withhold peremptory challenges 'altogether without impairing the constitutional guarantee of an impartial jury and a fair trial.' "[82] But "[w]hen States provide

---

[77] *Rivera v Illinois*, 556 US 148; 129 S Ct 1446; 173 L Ed 2d 320 (2009).

[78] *Id*. at 156.

[79] *Id*., citing *Bell*, 473 Mich at 292-299.

[80] *Rivera*, 556 US at 161-162.

[81] *Id*. at 152, quoting *United States v Martinez-Salazar*, 528 US 304, 311; 120 S Ct 774; 145 L Ed 2d 792 (2000).

[82] *Rivera*, 556 US at 152, quoting *McCollum*, 505 US at 57.

peremptory challenges (as all do in some form), they confer a benefit 'beyond the minimum requirements of fair [jury] selection,' . . . and thus retain discretion to design and implement their own systems[.]"[83]

In this state, the statutory right to peremptory challenges is found in MCL 768.12, which provides, in pertinent part, that "[a] person who is put on trial for an offense that is not punishable by death or life imprisonment shall be allowed to challenge peremptorily 5 of the persons drawn to serve as jurors."[84] "The prosecuting officers on behalf of the people shall be allowed to challenge 5 jurors peremptorily if a defendant is being tried alone . . . ."[85] "On motion and a showing of good cause, the court may grant 1 or more of the parties an increased number of peremptory challenges. The number of additional peremptory challenges the court grants may cause the various parties to have unequal numbers of peremptory challenges."[86] This statutory provision is reflected in the court rules.[87] Since Juror 5(a) was not dismissed from the jury, the trial court's decision denying defendant's peremptory challenge of Juror 5(a), even though predicated on the trial court's improper resolution of the prosecution's *Batson* challenge, only amounted to a partial denial of defendant's statutory right to peremptory challenges. Defendant was not in this case entirely deprived of his right "to challenge peremptorily 5 of the persons drawn to

---

[83] *Rivera*, 556 US at 157-158 (citations omitted).

[84] MCL 768.12(1).

[85] *Id.*

[86] MCL 768.12(2).

[87] See MCR 6.412(E)(1).

serve as jurors." After his peremptory challenge on Juror 5(a) was rejected, defendant did exercise a fourth peremptory challenge on Juror 8(a).[88]

Significantly, state law also provides a standard for reviewing procedural errors in criminal cases. The Michigan Legislature, which granted defendant the right to peremptory challenges, has also stated that a criminal conviction ought not be set aside for a procedural error except where, "after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."[89] The statutory provision granting peremptory challenges must be read in context with the statutory directive on procedural error in a criminal case. It is apparent that, to the extent the statutory right to peremptory challenges is impaired, MCL 769.26 guarantees that a criminal conviction will only be set aside where the error results in a miscarriage of justice.[90] This Court has interpreted the statutory phrase "miscarriage of justice" to require

---

[88] This appears to be the prospective juror earlier described by defense counsel as "snoozing" and the same prospective juror the trial court believed to be of Middle Eastern descent.

[89] MCL 769.26.

[90] The opinion for reversal suggests that our interpretation of MCL 769.26 ignores a portion of the statutory text, "which provides that an error on any matter of pleading or procedure shall not be a basis for reversal 'unless *in the opinion of the court*' the error has led to a miscarriage of justice." *Post* at 14. But as the opinion for reversal itself notes, a miscarriage of justice "means that the error more probably than not was outcome-determinative . . . ." *Post* at 14, citing *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). And as the opinion for reversal further observes, defendant here cannot show that the error was outcome-determinative because there is no record evidence that Juror 5(a) was biased.

The opinion for reversal also criticizes our analysis of this case because it results in "automatic affirmance." *Post* at 1. We believe the error in this case is more properly characterized as error that was not outcome-determinative. In the heat of a contentious

reversal of a criminal conviction only where, " 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative."[91] Thus, the Michigan Legislature has, as recognized in *Rivera*, "designed"

---

trial presented by zealous advocates before an impartial jurist, there are bound to be occasional errors in procedure or substance. Some of these errors materially affect the proceedings, but most do not. Our criminal justice system guarantees an accused the right to a fair trial, not a perfect one. Accordingly, convictions should be reversed only when trial error results in material harm to the criminal proceedings. This is the policy of the state of Michigan—a policy enacted into law, MCL 769.26. We disagree with the opinion for reversal, which posits that any *Batson* error categorically requires reversal. Instead we find guidance from the United States Supreme Court opinion in *Rivera*, which holds that "a one-time, good-faith misapplication of *Batson*" does not violate due process, *Rivera*, 556 US at 160, let alone amount to a "miscarriage of justice."

The opinion for reversal takes issue with our treatment of *Rivera*'s rejection of the assertion that "[t]he improper seating of a juror . . . is not amenable to harmless-error analysis," *id*. at 157, given that "[t]he *Rivera* Court did not offer any explanation for *how* such errors could be reviewed for harmfulness," *post* at 12. The opinion for reversal also claims our opinion "distracts from the ramifications of its remedy holding—a rule of automatic affirmance—with the irrelevant statement (with which none of us would disagree) that a defendant is entitled to a fair trial, not a perfect one." *Post* at 13 n 4. These criticisms lose all force given the *Rivera* Court's conclusion that "Rivera received precisely what due process required: a fair trial before an impartial and properly instructed jury, which found him guilty of every element of the charged offense." *Rivera*, 556 US at 162. Thus, regardless whether *Rivera* did not articulate "*how* such errors could be reviewed for harmfulness," *post* at 12, the Court was clearly satisfied that Rivera received, in its understanding, a "fair trial." The opinion for reversal makes no attempt to distinguish how its understanding of a "fair trial" differs from ours or that of the *Rivera* Court. Further, the opinion for reversal's criticisms are misplaced given that it highlights that *Rivera* did not provide any "merits argument" yet fails in every respect to take up the mantle and itself provide a "merits arguments" to support its position that defendant received an unfair trial.

[91] *Lukity*, 460 Mich at 495-496, quoting MCL 769.26. Note that Michigan's standard in this regard appears less onerous than the Illinois standard upheld in *Rivera*, which required a court to consider whether it was "clear beyond a reasonable doubt that a rational jury would have found [the defendant] guilty absent the error." *Rivera*, 556 US at 155 (quotation marks and citations omitted).

42

a system to review the erroneous denial of the statutory right to remove a particular juror peremptorily, and this Court is obliged to "implement" that design.[92]

Nonetheless, defendant argues that the denial of a peremptory challenge under these circumstances may be a structural error under Michigan law, even though peremptory challenges are not of federal constitutional dimension. As *Rivera* suggested, structural errors are constitutional errors that require automatic reversal.[93] Structural errors are those "structural defect[s] affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself."[94] The United States Supreme Court has found structural errors in "a very limited class of cases[.]"[95] "Such errors infect the entire trial process and necessarily render a trial fundamentally unfair. Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair."[96]

The United States Supreme Court has not found structural error from error that is not of constitutional dimension; indeed, the category of errors that require automatic reversal, i.e., "structural errors," has only been applied to certain constitutional errors in a

---

[92] *Rivera*, 556 US at 158.

[93] *Id*. at 161.

[94] *Arizona v Fulminante*, 499 US 279, 310; 111 S Ct 1246; 113 L Ed 2d 302 (1991).

[95] *Johnson v United States*, 520 US 461, 468; 117 S Ct 1544; 137 L Ed 2d 718 (1997).

[96] *Neder v United States*, 527 US 1, 8-9; 119 S Ct 1827; 144 L Ed 2d 35 (1999) (quotation marks and citations omitted).

43

"limited class" of cases.[97]  Because it is a statutory right, the denial of the right to

peremptory challenge has yet to fall under the "limited class of constitutional errors [that]

are structural and subject to automatic reversal."[98]  This Court has been similarly reluctant

to find structural error when there is no federal constitutional violation.  Indeed, this Court

has only once before—arguably, under Michigan law alone—found a "structural error

requiring automatic reversal" that was not squarely within this limited class of

constitutional errors.[99]  In *People v Duncan*, this Court held that automatic reversal is

required when a jury is allowed "to deliberate a criminal charge where there is a complete

failure to instruct the jury regarding any of the elements necessary to determine if the

---

[97] *People v Duncan*, 462 Mich 47, 51; 610 NW2d 551 (2000), citing *Neder*, 527 US at 8.
As the *Duncan* Court noted, the Court in *Neder* identified "several examples of structural
error":

> "Indeed, we have found an error to be 'structural,' and thus subject to
> automatic reversal, only in a 'very limited class of cases.' " *Johnson v United
> States*, 520 US 461, 468; 117 S Ct 1544; 137 L Ed 2d 718 (1997) (citing
> *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963)
> (complete denial of counsel); *Tumey v Ohio*, 273 US 510; 47 S Ct 437; 71 L
> Ed 749 (1927) (biased trial judge); *Vasquez v Hillery*, 474 US 254; 106 S Ct
> 617; 88 L Ed 2d 598 (1986) (racial discrimination in selection of grand jury
> [i.e., systematic exclusion of black jurors]); *McKaskle v Wiggins*, 465 US
> 168; 104 S Ct 944; 79 L Ed 2d 122 (1984) (denial of self-representation at
> trial); *Waller v Georgia*, 467 US 39; 104 S Ct 2210; 81 L Ed 2d 31 (1984)
> (denial of public trial); *Sullivan v Louisiana*, 508 US 275; 113 S Ct 2078;
> 124 L Ed 2d 182 (1993) (defective reasonable-doubt instruction). [*Duncan*,
> 462 Mich at 52, quoting *Neder*, 527 US at 8.]

[98] *Duncan*, 462 Mich at 51.

[99] *Id*. (explaining that *constitutional* errors may be structural in nature).

prosecution has proven the charge beyond a reasonable doubt."[100]  While *Duncan* cites an abundance of federal caselaw, the crux of *Duncan*'s analysis turns only on cited Michigan caselaw to extend a remedy of this magnitude, regardless of preservation, despite no definitive ruling from the United States Supreme Court on the issue.[101]

Under *Rivera*, an erroneous denial of a peremptory challenge is not of federal constitutional dimension; therefore, there can be no structural error arising out of a violation of the US Constitution.  However, that does not end the inquiry.  *Rivera* provided that state courts may determine as a matter of state law whether to review the wrongful denial of peremptory challenge for harmless error or, alternatively, to remedy such errors by automatic reversal.[102]  Therefore, even though there may not be a federal constitutional violation, we must determine whether there is an independent state ground for concluding that there is a structural error that mandates automatic reversal.

In ascertaining whether there are independent state grounds for finding structural error under the Michigan Constitution, our responsibility is to give meaning to the specific

---

[100] *Id.* at 52-53, citing *People v Lambert*, 395 Mich 296, 304; 235 NW2d 338 (1975), and noting *People v Newland*, 459 Mich 985, 593 NW2d 557 (1999).  See also 2A Gillespie, Michigan Criminal Law & Procedure (2d ed), § 24:16, p 148 (citing only *Duncan* as an example of the Michigan Supreme Court's finding "structural error not subject to review for prejudice").

[101] See *Duncan*, 462 Mich at 51-56.  See also 7 LaFave et al, Criminal Procedure (4th ed), § 27.6(d), p 158 ("With a few exceptions, lower courts also have not hesitated to find harmless incomplete jury instructions omitting other elements, at least when proof of the element was introduced and uncontested at trial.") (citations omitted).

[102] *Rivera*, 556 US at 158.

provision at issue, Const 1963, art 1, § 20.[103]  We are not obligated to follow the Supreme

Court's interpretation of the United States Constitution.[104]  Several factors are relevant to

determine whether the Michigan Constitution supports an interpretation different from that

of the federal Constitution, including the language of the provision at issue, the history of

the constitutional provision, and our common-law history.[105]

Beginning with the text of the Michigan Constitution itself, it guarantees that "the

accused shall have the right to a speedy and public trial by an impartial jury by an impartial

trial . . . ."  Const 1963, art 1, § 20.  This language is not materially different from that

provided in the United States Constitution.[106]  Because the pertinent language of the

Michigan Constitution is materially similar to that of the Sixth Amendment, the plain

language of our Michigan Constitution manifests an intent to provide the same guarantees

---

[103] *People v Tanner*, 496 Mich 199, 233 n 16; 853 NW2d 653 (2014).

[104] *Sitz v Dep't of State Police*, 443 Mich 774, 763; 506 NW2d 209 (1993).

[105] These factors are:

> 1) the textual language of the state constitution, 2) significant textual differences between parallel provisions of the two constitutions, 3) state constitutional and common-law history, 4) state law preexisting adoption of the relevant constitutional provision, 5) structural differences between the state and federal constitutions, and 6) matters of peculiar state or local interest.  [*People v Tanner*, 496 Mich 199, 233 n 17; 853 NW2d 653 (2014), quoting *People v Collins*, 438 Mich 8, 31 n 39; 475 NW2d 684 (1991).]

[106] The operative language of Const 1963, art 1, § 20, which provides that "[i]n every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury," is materially similar to that of US Const, Am VI, which states, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."

as those in the United States Constitution. Michigan law, like federal law, has steadfastly recognized that a peremptory challenge is a right given by statute, not by the Constitution. As the United States Supreme Court has repeatedly noted, peremptory challenges are not guaranteed by the Constitution and may be withheld entirely without violating the Constitution.[107] The language of the Michigan Constitution provides no textual reason why the Court should interpret Const 1963, art 1, § 20 in any way other than as consistent with the Sixth Amendment, which, as previously noted, is not implicated when a defendant's peremptory challenge is erroneously denied.[108]

Similarly, review of our common-law history does not suggest otherwise.[109] Most recently, in *People v Miller*, this Court addressed whether a defendant was entitled to a

---

[107] See *Martinez-Salazar*, 528 US at 311; *Rivera*, 556 US at 152.

[108] Michigan's constitutional history supports this conclusion as well. The operative language from Const 1963, art 1, § 20 is nearly identical to the applicable provisions in prior Michigan Constitutions. See Const 1835, art 1, § 10 ("In all criminal prosecutions, the accused shall have the right to a speedy and public trial by an impartial jury of the vicinage . . . ."); Const 1850, art 1, § 28 ("In every criminal prosecution the accused shall have the right to a speedy and public trial by an impartial jury . . . ."); Const 1908, art 1, § 19 ("In every criminal prosecution the accused shall have the right to a speedy and public trial by an impartial jury . . . .").

[109] This Court's order granting leave cited a plurality opinion in *Hardison v State*, 94 So 3d 1092, 1101 & n 37 (Miss, 2012), which identified "[a]t least five states" that have adopted an automatic-reversal rule as a matter of state law and followed those states. Two of these cases, however, were decided pre-*Rivera* and are therefore of limited value. See *Angus v State*, 695 NW2d 109 (Minn, 2005), and *State v Vreen*, 26 P3d 236 (Wash, 2001), both abrogated by *Rivera*, 556 US 148.

The New York Court of Appeals in *People v Hecker*, 15 NY3d 625, 661; 942 NE2d 248 (2010), "look[ed] to our precedents and [held] that [a *Batson* error] under New York law mandates automatic reversal." The court recognized that although they are "not a trial tool of constitutional magnitude, peremptory challenges are a mainstay in a litigant's strategic arsenal . . . ." *Id*. at 662 (quotation marks and citation omitted). As amicus

PAAM pointed out, the dissent in *Hecker* contended that "[t]he majority offers no reasoned justification for this holding [of automatic reversal], merely relying on pre-*Rivera* precedents," and that the rule of automatic reversal is unwise, as it "load[s] the dice against the People" because a "defendant, who need not fear an appeal by the People, can and generally will vigorously contest any prosecution use of a peremptory challenge that might raise *Batson* problems," while "the People will be reluctant to do the same thing, lest they lead the trial judge into an error that would upset a conviction." *Id.* at 667-668 (Smith, J., dissenting). As the *Hecker* dissent observed, the *Rivera* Court itself had expressed this concern, stating that automatic reversal would " 'likely discourage trial courts and prosecutors from policing a criminal defendant's discriminatory use of peremptory challenges.' " *Id.* at 668, quoting *Rivera*, 556 US at 160.

The Supreme Court of Iowa in *State v Mootz*, 808 NW2d 207 (Iowa, 2012), held that automatic reversal was required because a defendant tried by an impartial jury cannot show prejudice from the loss of a peremptory challenge. The court then stated that "[a]ny other conclusion would leave the defendant without a remedy. We do not think this is the result intended when [Iowa Rule of Criminal Procedure] 2.18(9) was drafted." *Id.* at 225-226. So, the court interpreted Rule 2.18(9)—which guarantees a defendant four peremptory strikes of prospective jurors, *id.* at 220—to require "automatic reversal of a defendant's conviction when the trial court's erroneous ruling on a reverse-*Batson* challenge leads to the denial of one of the defendant's peremptory challenges." *Id.* at 226.

Finally, the Massachusetts Supreme Court in *Commonwealth v Hampton*, 457 Mass 152; 928 NE2d 917 (2010), "continued to adhere" to its pre-*Rivera* precedent that "the erroneous denial of a peremptory challenge requires automatic reversal, without a showing of prejudice." *Id.* at 164. This precedent established that "the right to be tried by an impartial jury is so basic to a fair trial that an infraction can never be treated as harmless error. Thus, . . . the erroneous denial of the right to exercise a proper peremptory challenge is reversible error without a showing of prejudice." *Commonwealth v Wood*, 389 Mass 552, 564; 451 NE2d 714 (1983), citing *Commonwealth v Soares*, 377 Mass 461, 492 (1979).

In an additional case of note, the Delaware Supreme Court in *McCoy v State*, 112 A3d 239 (Del, 2015), recognized that peremptory challenges are "one of the most important of the rights" for an accused." *Id.* at 255 (quotation marks and citation omitted). Noting that *Rivera* held that a denial of a peremptory challenge does not violate the Constitution, the *McCoy* court relied on a provision in the Delaware Constitution that had been interpreted to include the right to exercise peremptory challenges. *Id.* at 255-256. Accordingly, the court held that the erroneous denial of a peremptory challenge requires automatic reversal. *Id.* at 255.

On the other hand, many states have concluded that review for harmless error, not automatic reversal, applies as the remedy for a loss of a peremptory challenge, with some states even going so far as to overrule their precedent after the *Rivera* decision.

For instance, in *State v Carr*, 300 Kan 1; 331 P3d 544 (2014), rev'd on other grounds 577 US 108 (2016), a Kansas trial court erroneously sustained the prosecution's *Batson* challenge to a defendant's peremptory strike. *Id*. at 130. On appeal in the Kansas Supreme Court, the defendant argued that the error was structural, while the state contended that harmless-error review applied. *Id*. The court discussed *Rivera* and noted that the first issue to be decided was whether the judge acted in good faith. *Id*. at 130-131. Citing our decision in *Pellegrino*, the court concluded that the judge did not deliberately misapply *Batson* (as was true in *Pellegrino*); rather, the trial court's *Batson* examination was incomplete. *Id*. at 132-133. The court then outlined the differing caselaw addressing the remedy for a good-faith mistake for an erroneous denial of a peremptory challenge, primarily discussing the Iowa decision in *Mootz*. *Id*. at 134-136. The court then analyzed the split among the states on this question and observed that since *Rivera*, the trend among the federal circuits has been to apply harmless-error review instead of automatic reversal. *Id*. at 136-138, citing *United States v Gonzalez-Melendez*, 594 F3d 28 (CA 1, 2010); *Jimenez v Chicago*, 732 F3d 710 (CA 7, 2013); *Avichail ex rel TA v St John's Mercy Health Sys*, 686 F3d 548 (CA 8, 2012). See also *United States v Lindsey*, 634 F3d 541 (CA 9, 2011); *United States v Williams*, 731 F3d 1222 (CA 11, 2013). The court had not previously addressed the question but noted that a prior Kansas Court of Appeals case had suggested that the denial of a valid peremptory challenge is prejudicial. *Carr*, 300 Kan at 138. However, other Kansas Supreme Court decisions noted that peremptory challenges were viewed as "little more than a procedural device to ensure compliance with a defendant's constitutional right to trial by a fair and impartial jury[.]" *Id*. The Kansas Supreme Court concluded that harmless-error analysis applied and that such errors are not structural, because "[t]he mistake was made in good faith, and our Kansas precedent, although sparse, favors the view that a peremptory challenge is simply a procedural vehicle for vindication of a defendant's right to an impartial jury." *Id*. at 139.

A number of other states have relied on a similar rationale as that in *Carr*, i.e., that the error is not of federal constitutional dimension and there is no independent state law supporting a finding of structural error. See *People v Singh*, 234 Cal App 4th 1319; 184 Cal Rptr 3d 790 (2015); *People v Novotny*, 320 P3d 1194; 2014 CO 18 (Colo, 2014); *Robinson v State*, 255 P3d 425; 2011 OK CR 15 (Okla Crim App, 2011); *State v Lindell*, 245 Wis 2d 689; 629 NW2d 223 (2001); *In re LDB*, 454 P3d 908; 2019 WY 127 (2019); *State v Hickman*, 205 Ariz 192; 68 P3d 418 (2003); *People v Rivera*, 227 Ill 2d 1; 879 NE2d 876 (2007).

new trial when a convicted felon sat on the jury.[110]  To qualify as a juror under Michigan law, "a person shall" "[n]ot have been convicted of a felony."[111]  Defendant had the right to challenge a prospective juror who "is not qualified to be a juror" for cause.[112]  The Court held that the "the presence of a convicted felon on defendant's jury did not constitute structural error."[113]  There was no constitutional error because "there is no constitutional right to have a jury free of convicted felons."[114]  Further, " 'not every instance of misconduct in a juror will require a new trial.  The general principle underlying the cases is that the misconduct must be such as to affect the impartiality of the jury[.]' "[115]  "The misconduct must be such as to reasonably indicate that a fair and impartial trial was not had[.]"[116]  Significantly, there was no evidence that the juror was actually partial or biased.[117]  Thus, even though the defendant was improperly denied a challenge for cause,

---

[110] *People v Miller*, 482 Mich 540; 759 NW2d 850 (2008).

[111] MCL 600.1307a(1)(e).

[112] MCR 2.511(D)(1).

[113] *Miller*, 482 Mich at 556.

[114] *Id.*

[115] *Id.* at 551, quoting *People v Nick*, 360 Mich 219, 230; 103 NW2d 435 (1960) (quotation marks and citation omitted).  While *Miller* focused on the misconduct of a juror that allowed the juror to be improperly seated, the rule from *Miller* applies in the context of reviewing a verdict rendered by a jury that included an improperly seated juror.

[116] *Miller*, 482 Mich at 551, quoting *Nick*, 360 Mich at 230.

[117] *Miller*, 482 Mich at 552.

a new trial was not required.[118]  "[T]he proper inquiry is whether the defendant was denied his right to an impartial jury.  If he was not, there is no need for a new trial."[119]

In *People v DeHaven*,[120] the Court addressed whether a defendant who was charged with rape was entitled to a new trial when two jurors failed to disclose that a family member had also been convicted of rape.  The Court reasoned that the "[t]he right to be tried by an impartial jury is a constitutional guaranty."[121]  Such a jury must "consist[] of twelve impartial [people]."[122]  The examination of those jurors during voir dire is "to ascertain whether it is wise and expedient to exercise the right of peremptory challenge given to parties by the law."[123]  The challenged jurors said that they could fairly and impartially try the case, but they did not disclose their familial connection.[124]  This Court held "that the relationship of these two jurors to one who had committed a similar crime was such that it deprived them of the capacity to act impartially.  Defendant has the right to a trial by an impartial jury.  We cannot say that he had such a trial."[125] As recognized in *Miller*, "the crux of *DeHaven*'s holding was that a defendant has a constitutional right to an impartial

---

[118] *Id*. at 561.

[119] *Id*.

[120] *People v DeHaven*, 321 Mich 327; 32 NW2d 468 (1948).

[121] *Id*. at 334.

[122] *Id*. (quotation marks and citations omitted).

[123] *Id*. at 332 (quotation marks and citation omitted).

[124] *Id*. at 334.

[125] *Id*.

jury and, because the jurors at issue in *DeHaven* lacked the capacity to act impartially, the defendant was entitled to a new trial."[126]

Those cases demonstrate that the Court has long held that a criminal defendant has only the right to an impartial jury. Denials of peremptory challenges or even denials of challenges for cause do not necessarily violate that right. If a challenge is denied, only a showing of prejudice demonstrates that the Michigan Constitution has been violated.[127] The denial of the right to challenge jurors peremptorily does not, by itself, deprive a criminal defendant of the right to an impartial jury.[128] Further, MCL 768.12(2) recognizes that the number of peremptory challenges may not be equal between the two parties, as a judge may give one party more than the other. All of this provides solid support for the conclusion that peremptory challenges in Michigan have long been considered part of the means to the end of an impartial jury, rather than part of that end itself.

Our conclusion promotes consistency within our caselaw. First, it holds that the same remedy applies to erroneous denials of peremptory challenges and challenges for cause. Under *Miller*, challenges for cause are subject to harmless-error review.[129] Under

---

[126] *Miller*, 482 Mich at 560, citing *DeHaven*, 321 Mich at 334. Other cases hold similarly in both the criminal and civil context. See *People v Mullane*, 256 Mich 54; 239 NW 282 (1931) (holding that a defendant's right to an impartial jury was not violated when his counsel exercised all peremptory challenges to which he was entitled); *O'Neil*, 67 Mich at 561 (holding that the right to a "fair, impartial, and qualified jury" was unimpaired when a party exhausted his peremptory challenges).

[127] See *Miller*, 482 Mich at 561; *Pearce v Quincy Mining Co*, 149 Mich 112, 116-117; 112 NW 739 (1907).

[128] See *People v Mullane*, 256 Mich 54, 56-57; 239 NW 282 (1931).

[129] *Miller*, 482 Mich at 556, 561.

52

Michigan law, only a denial of a challenge for cause that results in an impartial jury requires reversal. If the Court holds here that denials of peremptory challenges are subject to automatic reversal, this would create a significant and illogical discrepancy in Michigan law. Specifically, it would create a situation in which the denial of peremptory challenges would require automatic reversal, but challenges for cause would be subject to harmless-error review, where reversal is only required if a biased jury actually sits. This situation would be untenable, given that challenges for cause are typically granted greater protection.[130] Our conclusion also maintains consistency with the Court's recent caselaw discussing preserved constitutional error. A decision holding that peremptory challenges are subject to automatic reversal would create a peculiar scenario in which automatic reversal applies to a denial of a statutory right, while other nonconstitutional errors are still subject only to harmless-error review. In sum, we find no historical or textual reason to interpret the right to an impartial jury under the Michigan Constitution in the context of erroneous denials of peremptory challenges in a way different than that of the federal Constitution.

As presented in the opinion for reversal, the argument commonly made in support of the position that an improper denial of a peremptory challenge following a successful *Batson* challenge should be deemed a structural error is that the error is simply too hard to measure; or, as more aptly argued by the defendant in *Rivera*: "The improper seating of a

---

[130] See *Martinez-Salazar*, 528 US at 316. In addition, amicus PAAM persuasively argues that, if automatic reversal applies in this situation, "even the legislature could not alter the number of peremptory challenges, or abolish them, which is to give [peremptory challenges] constitutional status though the law is clear that they are a statutory creation."

juror . . . is not amenable to harmless-error analysis because it is impossible to ascertain how a properly constituted jury—here, one without [the improperly seated juror]—would have decided his case."[131]  Justice Marilyn KELLY elaborated on this argument in her dissenting opinion in *Bell*:

> Although no constitutional guarantee exists with regard to them, *Batson* errors resulting in a denial of the use of peremptory challenges must be structural.  They attack the fundamental framework of the trial proceeding.  They change the very makeup of the jury.  And they do not occur during the presentation of evidence.  Given that they do not involve evidence, they cannot be quantitatively assessed in the context of other evidence.  This fact is a further indicator that they are not in the nature of trial errors.[132]

*Ubi jus, ibi remedium*, "the principle that where one's right is invaded or destroyed, the law gives a remedy to protect it or damages for its loss,"[133] "is indeed a deep-seated principle of Anglo-American law . . . ."[134]  But then again, "[t]he Due Process Clause does not require states to provide effective remedies for every state-created right."[135]  Indeed, *Rivera* highlighted that "[t]he Due Process Clause . . . safeguards not the meticulous

---

[131] *Rivera*, 556 US at 157.

[132] *Bell*, 473 Mich at 311-312 (KELLY, J., dissenting).

[133] *Oxford Dictionary of Law* (8th ed).

[134] The Supreme Court 2008 Term, *Leading Cases—Constitutional Law, Due Process*, 123 Harv L Rev 212, 219 (2009).

[135] *Id.* at 218-219; see also *id.* at 219 n 63, citing *Webster v Doe*, 486 US 592, 613; 108 S Ct 2047; 100 L Ed 2d 632 (1988) (Scalia, J., dissenting) (arguing that "it is simply untenable [to suggest] that there must be a judicial remedy for every constitutional violation" in light of the sovereign-immunity, political-question, and equitable-discretion doctrines), and Fallon & Meltzer, *New Law, Non-Retroactivity, and Constitutional Remedies*, 104 Harv L Rev 1731, 1786 (1991) (describing rights without "individually effective remedies" as a "fact of our legal tradition").

observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.' "[136]  " '[A] principal reason for peremptories' . . . is '*to help secure* the constitutional guarantee of trial by an impartial jury.' "[137]  And when presented with a variant of Justice KELLY's argument that *Batson* errors "attack the fundamental framework of the trial proceeding" and "change the very makeup of the jury,"[138] the *Rivera* Court dispatched it, stating that it did not "withstand scrutiny."[139]  Further, while the *Rivera* Court readily acknowledged that an error involving peremptory challenges " 'may . . . result[] in a jury panel different from that which would otherwise have decided [the] case,' " it was not at all persuaded this fact alone transformed an aspirational and prophylactic procedural rule into a violation of the Sixth Amendment right to an impartial jury or the Fourteenth Amendment right to due process, let alone structural error.[140]  Accordingly, just as *Rivera* dispatched with the argument that a *Batson* error "is not amenable to harmless-error analysis because it is impossible to ascertain how a properly constituted jury—here, one without [the improperly seated juror]—would have decided his case," we too reject this same unpersuasive argument that is set forth in the opinion for reversal in this case.

---

[136] *Rivera*, 556 US at 158, quoting *Spencer v Texas*, 385 US 554, 563-564, 87 S Ct 648, 17 L Ed 2d 606 (1967).

[137] *Rivera*, 556 US at 159, quoting *Martinez-Salazar*, 528 US at 316 (emphasis added).

[138] *Bell*, 473 Mich at 312 (KELLY, J., dissenting).

[139] *Rivera*, 556 US at 157.

[140] *Id.* at 158 (citations omitted).

We do not take lightly that, for all intents and purposes, harmless-error review will almost always result in automatic affirmance.[141] This, however, does not mean *Batson* and its progeny are rendered ineffective. Courts must strike a balance between defendant's right to fully participate in the jury-selection process and the trial court's duty to police that process to insure against invidious discrimination. As the United States Supreme Court observed, "[t]o hold that a one-time, good-faith misapplication of *Batson* violates due process would likely discourage trial courts and prosecutors from policing a criminal defendant's discriminatory use of peremptory challenges. The Fourteenth Amendment does not compel such a tradeoff."[142]

The above quotation from *Rivera* represents the only guiding statement of law offered by the Supreme Court of the United States to assist state courts in determining "whether [*Batson*] errors deprive a tribunal of its lawful authority and thus require automatic reversal." Yet, the opinion for reversal in this case does not heed this guidance; in fact, it would hold the opposite and conclude that the trial court's "one-time, good-faith misapplication of *Batson* violates due process."

The opinion for reversal offers no reasoned justification to support a rule of automatic reversal for *Batson* errors. And we find such a rule would be unwise, as it

---

[141] Exceptions may be rare but not impossible. For instance, in this case, had the trial court sua sponte rejected defense counsel's last peremptory challenge based on *Batson* as to Juror 8(a), who the court had mentioned was a person of Middle Eastern descent who was snoozing during voir dire, reversal may have been required because the trial court had no legal basis at all to justify an arbitrary decision, perhaps even under an unpreserved-plain-error standard.

[142] *Id.* at 160.

56

"load[s] the dice against the People" because a "defendant, who need not fear an appeal by the People, can and generally will vigorously contest any prosecution use of a peremptory challenge that might raise *Batson* problems," while "the People will be reluctant to do the same thing, lest they lead the trial judge into an error that would upset a conviction."[143]  In our view, a rule of automatic reversal for *Batson* error may incentivize tactics that undermine the aspirations of *Batson* itself and would also "undermine public confidence in the fairness of our system of justice."[144]

### E.  APPLICATION OF HARMLESS-ERROR REVIEW

We conclude that the outcome of this case would have not have been any different had defendant been allowed the peremptory challenge on Prospective Juror 5(a). Prospective Juror 5(a) acknowledged during the voir dire, "My father, my brother, stepmother all deputy sheriffs, and military police in my family, nephew and brother.  My grandfather was an attorney who passed away but I think that's it."  The trial court then responded, "All right.  Juror number five, you heard what I said to juror number four which is that the law states that a police officer's testimony is to be weighed the same way you weigh the testimony of any other witness[;] they don't come in with an advantage [and] they don't come in with a disadvantage.  Given the extensive law enforcement connections in your family will you be able to [do] that in this case?"  Prospective Juror 5(a) replied, "Yes."

---

[143] *Hecker*, 15 NY3d at 667-668 (Smith, J., dissenting).

[144] *Batson*, 476 US at 87.

57

During voir dire, when defense counsel was afforded the opportunity to question the prospective jurors, he asked Prospective Juror 5(a) to assume he was representing her in a criminal trial, stating: "And so we're sitting at the table, and I'm doing this kind of thing sitting at the table, and I turn to you and I say this is—I'm taking this jury. I'm accepting this jury. And you look up and you see 12, 14, whatever, you see 12 or 14 people and they're all African-American the People who are going to sit in judgment of you. Would you be concerned?" She replied, "I hope that I'm a person that looks beyond that. I work for the Dearborn School District and there's a lot of different culture. . . . I enjoy meeting other cultures and working with people getting to know people. I hope I don't look at people's skin color. I don't believe I do. It's their actions." Later, when defense counsel questioned Prospective Juror 5(a) in regard to openly carried firearms, she asked defense counsel for clarification, stating, "Just to be clear you're only asking if we have an opinion about open carry? If that's the case then that's okay. If it's open carry it's not a drawn weapon. That's a right. But being a police officer's daughter it's not going to concern me unless the gun is raised. There's two different things here. I'm trying to follow what you're asking. And you're only asking the opinion of whether or not if the gun is in use; is that correct?" Defense counsel responded, "I may be clearer so if I'm understanding what you're saying. When a person does an open carry, as the daughter of a police officer, do you have an opinion about that person doing an open carry?" She answered, "It's the law. They're allowed to have it. And I see they have it and it's not in use or being misused there's no problem." As is clear, the record reflects that Juror(5)(a) expressed that she would have no difficultly in following the law, even as explained by defense counsel.

Further, there is no indication on the record that Juror (5)(a) was biased such that defendant was denied his right to an impartial jury. Juror 5(a)'s statement that she could be impartial supports not only a conclusion that Juror (5)(a) was actually impartial but also that she was not actually biased. Other statements from voir dire make this clear. When asked if she would be concerned about being tried by an all-black jury, Juror (5)(a) also clarified that she "hope[d]" that she was a person that "looks beyond [race]" and noted that she worked for the Dearborn School District where she encountered a lot of different people and cultures. She clarified that she "[didn't] believe" she looked at people's skin color; rather, "[i]t's their actions." That testimony does not show that it was more probable than not that Juror 5(a) was biased. She used the word "hope" in response to a hypothetical question about being tried by an all-black jury. Just as defense counsel asked Juror 5(a) about a hypothetical scenario, Juror 5(a) used language, i.e., "hope," that reflected the hypothetical nature of her answer. But she then clarified that, after thinking for another second, that she did not believe that such a situation would concern her. That testimony does not demonstrate a miscarriage of justice or demonstrate that it is more probable than not that trial court's erroneous denial of a peremptory challenge on Juror 5(a) prejudiced defendant. For those reasons, defendant has not demonstrated that Juror (5)(a) was biased against him.

## III. CONCLUSION

With respect to defendant's *Batson* challenge, we conclude that the trial court did not clearly err by finding that the prosecution's race-neutral explanation was not a pretext to improper purposeful discrimination. We further conclude that the trial court erroneously

59

denied defendant's peremptory challenge to Prospective Juror 5(a) based on the court's clear error in granting the prosecution's *Batson* challenge. However, because there is no evidence that Juror 5(a) was actually biased against defendant, we conclude that defendant is not entitled to relief.

Brian K. Zahra<br>
David F. Viviano<br>
Elizabeth T. Clement

STATE OF MICHIGAN

SUPREME COURT


PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                  No. 159346

JACQUES JEAN KABONGO,

      Defendant-Appellant.

_____

MCCORMACK, C.J. (*for reversal*).

      I concur with the lead opinion that the trial court clearly erred by denying defense counsel's request to exercise a peremptory challenge to remove Prospective Juror 5 (Juror 5). But I disagree with the rest of the lead opinion's conclusions. I would hold that the trial court violated *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), by accepting the prosecution's race-neutral reasons for excusing Prospective Juror 2 (Juror 2). Because a *Batson* violation requires automatic reversal, *People v Bell*, 473 Mich 275, 293; 702 NW2d 128 (2005), I would reverse the Court of Appeals and remand for a new trial on that basis. Had my view prevailed, it would have been unnecessary to reach the appropriate remedy for the erroneous failure to dismiss Juror 5. But because it has not, I must disagree with the lead opinion's conclusion that the error of refusing to remove Juror 5 is subject to harmless-error review. As many courts have concluded and the majority all but concedes, such a rule effectively would lead to automatic affirmance.

# I. JUROR 2

A *Batson* claim that a prosecutor is using a peremptory challenge based on race is subject to the following three-part inquiry: "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Snyder v Louisiana*, 552 US 472, 476-477; 128 S Ct 1203; 170 L Ed 2d 175 (2008) (cleaned up).

I agree with the lead opinion that the trial court correctly concluded that the prosecutor offered a race-neutral reason for removing Juror 2. But unlike the lead opinion, I conclude that the trial court clearly erred in applying Step Three of *Batson*. When the defendant raised his *Batson* challenge, the prosecutor gave the following explanation for her decision to use a peremptory challenge to remove Juror 2:

> With regards to juror number two she had what seemed, at least to me, to be a very difficult time with short-term memory. She could not remember the Court's first question when asked what her occupation was and she couldn't remember any of the additional questions after that. She had to ask a few times. Also, she indicated she's having a senior moment here and there. She indicated, when asked about contact with the police, she thought she had been pulled over or she thought she had contact with the police before. She couldn't remember any sort [of] specifics. Same with whether herself or her family were a victim of the crime she thought, yes, maybe robberies or armed robbery or something, I can't remember, I can't remember, I don't remember how long ago, I don't remember anything. So she had a problem with memory and it's the People[']s concern for her that if we're going to hear testimony today and then have a long weekend and come back on Monday. And, so, the likelihood that she would forget testimony seemed fairly probable and the People were concerned about that.

The trial court accepted the prosecutor's reason:

2

I'm going to find in this case that the prosecutor as to juror number two has offered a race neutral explanation for the peremptory challenge and further has articulated a neutral explanation for the dismissal. Juror number two did indeed have a difficult time with memory she did discuss senior moments. She had to kind of had to step back and reach back in her memory to recall things such as whether or not she had been the victim of a crime, such as—there were some other specific ones. But I do remember she did seem to have a problem keeping up with this case.

And Batson's second step does not required [sic] articulation of [a] persuasive reason or even a plausible one[;] so long as the reason is not inherently discriminatory it suffices. And that's the case of Rice versus Collings, 546 U.S. 333 which is a (2006) case.

So here the prosecutor has provided a race neutral explanation for her peremptory challenges to number two so I'm going to then deny the Batson challenge as to juror number two.

And I'll even go to the third step which requires that the trial Court make a final determination of whether the challenger of the strike, which would be the defense, has established purposeful discrimination. And whether there is purposeful discrimination is the persuasiveness of the prosecutor's justification for the peremptory strike. It comes down to whether the trial Court finds the prosecutor's race neutral explanations to be creditable [sic]. And in this case I will find that it was reasonable, her explanation is not improbable, there was a rationale that had some basis in accepted trial strategy. And so I'm going to deny the Batson challenge as to juror number two.

First, the trial court clearly erred in applying *Batson* because it concluded that once the prosecutor offered a race-neutral reason for dismissing Juror 2, the defendant's *Batson* challenge could be denied. The court stated, "I'll even go to the third step" and determine whether the defendant has established purposeful discrimination, as if it didn't have to. This procedural misstep reveals that the trial court misunderstood the *Batson* inquiry and applied it incorrectly.

Second, to substance: the trial court clearly erred by concluding that the prosecutor's race-neutral explanation for dismissing Juror 2 was not pretext for purposeful

discrimination. The lead opinion emphasizes that our review of the trial court's ruling on *Batson* Step Three is entitled to great deference and reviewed only for clear error. True enough. In a typical case, where "[t]here will seldom be much evidence bearing on that issue, . . . the best evidence often will be the demeanor of the attorney who exercises the challenge," so "[d]eference to trial court findings on the issue of discriminatory intent makes particular sense in this context . . . ." *Hernandez v New York*, 500 US 352, 365; 111 S Ct 1859; 114 L Ed 2d 395 (1991).

Not so here. Unlike the prosecutor's reasons for excusing Prospective Jurors 3 and 14, the prosecutor's reason for dismissing Juror 2 is not grounded in demeanor evidence or based in personal observations uncaptured by a cold record.[1] No, the question of Juror 2's alleged "difficult time with memory" is one related to the substance of the juror's answers, and therefore one we easily can review.

The record doesn't support the trial court's conclusion that the prosecution's race-neutral reason for excusing Juror 2 was credible. The court accepted the prosecutor's exaggeration about Juror 2's memory; the prosecutor claimed that the juror mentioned "a senior moment here and there." But that was not correct. When asked about whether the jurors, their families, or their close friends had been the victim of a crime, Juror 2 answered that her family had been, but "I can't remember the years and stuff. Senior moment. I'm

---

[1] The lead opinion asserts otherwise, citing the trial court's statements that Juror 2 had to "reach back into her memory to recall things" and "did seem to have a problem keeping up with this case." Neither of these observations suggests it is grounded in anything the trial court purportedly observed rather than Juror 2's answers to questions. A clear contrast is the trial court's ruling on Juror 3, whom it dismissed after agreeing with the prosecutor that she sat with her arms crossed and rolled her eyes. *That* is a quintessential demeanor/credibility finding on which we should be most deferential to the trial court.

4

64 so . . . ." Thus, Juror 2 mentioned one "[s]enior moment" related to recalling the specific year of an event in her past. The court, however, accepted the prosecutor's misstatement: "Juror number two did indeed have a difficult time with memory she did discuss senior *moments*." (Emphasis added.)

The prosecutor also erroneously stated that Juror 2 couldn't remember the court's question when asked what her occupation was "and she couldn't remember any of the additional questions after that." To the contrary, Juror 2 quickly answered the prosecutor's remaining questions without prompting and without the prosecutor reminding her what those questions were. This is that exchange between the prosecutor and Juror 2 on those points:

> *Potential Juror Two*: Good morning.
>
> *The Court*: I'm going to ask you your occupation, your marital status, and if you are married what your spouse does and your highest level of education?
>
> *Potential Juror Two*: I'm retired.
>
> *The Court*: And what are you retired from?
>
> *Potential Juror Two*: Counseling.
>
> *The Court*: Okay.
>
> *Potential Juror Two*: I was a counselor and I retired a year ago.
>
> *The Court*: Are you enjoying your retirement?
>
> *Potential Juror Two*: Yeah. I'm divorced. Level of education Bachelors in Criminal Justice Administration.
>
> *The Court*: Thank you, juror number two.

The prosecutor erroneously characterized Juror 2's answers as "I don't remember anything" when she stated only that she couldn't remember the specific timing of events that happened long ago. Although Juror 2 stated that she "can't remember the years and stuff" when her family had been victims of crime, she did say that it had involved "robbery and stuff like that" but had occurred "a long time ago nothing recent." The prosecutor made no attempt to ask the juror for additional information to test the extent of her perceived memory lapse.

While the prosecutor correctly stated that the juror couldn't remember specifics about her prior contact with police and being a victim of a crime, I find these failures unremarkable when weighed against the prosecutor's mischaracterization of Juror 2's answers. Nor do I credit the lead opinion's reference to Juror 2's vague response about her prior jury service in which she couldn't recall specifically why she didn't have to serve ("the defendant pled or something and then we left"). The failure to remember details from long-ago events is not unusual. Nor does it suggest memory problems that someone would not remember a fact of so little consequence, such as the reason she didn't have to serve on a jury previously.

Juror 2's alleged failure to recall details about being a crime victim and her experience with the police (beyond just the years involved) provide the strongest support for the trial court's finding. But standing alone, Juror 2's statements that she couldn't remember "the years and stuff" about her family having been victims of a crime and that she had "been pulled over and stuff like that before" is not enough to uphold the trial court's basis for allowing her to be dismissed. The lead opinion characterizes the former response as evidencing that Juror 2 was unable to recall "any details" of the crime, but that is another

6

exaggeration—that Juror 2 said she couldn't remember "stuff" about having been a crime victim does not mean she couldn't remember any details. The prosecutor never *asked* her for details. The juror's general statements with no request for follow-up do not support the lead opinion's characterization.

Because I believe the trial court committed a *Batson* error in accepting the prosecutor's race-neutral reason for dismissing Juror 2, I would reverse the Court of Appeals on this basis and remand for a new trial.

## II. JUROR 5

The trial court's treatment of the prosecution's *Batson* challenge to Juror 5 confirms its error in denying the defendant's *Batson* challenge to Juror 2. The court's application of *Batson*'s third step to the defendant's peremptory challenge to dismiss Juror 5 stands in sharp contrast to its deferential treatment of the prosecutor's proffered reason for dismissing Juror 2. As to the former, the trial court twice explained that it had a duty to "probe" the defense's reasons for excusing Juror 5 and apply a "more penetrating analysis" to those reasons:

> *The Court*: First of all, again, with Batson the first step is whether the facts and circumstances of the voir dire suggests that racial discrimination motivated a strike. Evidence raising merely an inference of discrimination surmounts the first Batson test creating a prima facie case. I think in this case the prosecution, as to juror number five, has established a prima facia [sic] case because this is the third peremptory challenge which the defense has raised. The other two were Mr. Trueblood, juror number 11, and Ms. Lori Monkaba who was juror number 14.
>
> The step two is to articulate a neutral explanation related to the particular case to be tried. And in this particular case Mr. Halpern articulates the fact that she has police officers in her family. But during the voir dire of number five I did not hear any additional voir dire directed to her about her relationships with police officers. She testified clearly to me during the voir

7

dire that her relationships would not affect her ability to be a fair and impartial juror and she understood that the testimony of a police officer is to be put to the same challenges of weight and credibility as that of any other witness.

As far as any—as far as the fact that she didn't have a conviction or couldn't remember a conviction I'd far rather a juror disclose that she thinks that she may have a conviction and we investigate it and find out that she doesn't rather than a juror lie and say I don't have one when in reality they do. I don't feel it's appropriate to kick juror number five because she's raised a concern which the Court was able to address.

Finally, when we talk about evaluating the plausibility of a race neutral explanation for a strike in light off [sic] all the evidence with a bearing on it this inquiry, according to the Tennielle case necessarily includes careful consideration of relevant, direct, and circumstantial evidence of intent to discriminate. And, also, in this case I have asked the defense very specifically what problems they have with juror number five considering the fact that she has been seated on this jury since the original 14 jurors were impanelled. What I'm hearing is feelings. There is—I have to—I'm charged as the judge—I'm charged as the judge to probe more deeply when someone just talks about feelings. And there's not sufficient facts here. I'm not hearing about somebody that's sleeping, somebody nervous, preoccupied, angry, disrespectful or agitated. I'm just hearing about feelings. I'm tasked with engaging in a more penetrating analysis focussing on ascertaining whether the proffered race neutral reason is pretext intended to mask a discrimination. Evaluation of the central question requires the Court to permit argument by the opposing counsel who bears the burden of persuading the Court that the—that there was purposeful discrimination here. This record lacks any objective indicia of concern—concerning the impartiality of juror number five or that she is otherwise unfit to serve as a juror in this case. So I'm going to find—I'm sorry, let me just double check. I'm going to find that the reason offered is insufficient and I am going to find that the challenger has established purposeful discrimination. So I'm going to keep juror number five on the jury . . . .

Juror 5's strong ties to law enforcement provided a valid race-neutral reason for her removal; given that this case involved a pure credibility contest between the defendant and two police officers, those ties provided an obvious basis for defense counsel to exclude her. Yet the trial court parsed defense counsel's other reasons for asking that Juror 5 be excused

8

and denied that request because those other reasons were unsupported by the record or insufficient. Had the court engaged in the same "more penetrating analysis" of the prosecutor's reason for excusing Juror 2, it would have recognized the prosecutor's mischaracterizations of the record and, I believe, could not have reached the conclusion it did.

### III. REMEDY

Because I agree with the lead opinion that the trial court clearly erred by denying defense counsel's request to remove Juror 5, the question becomes what remedy, if any, is required. Contrary to the lead opinion, and consistent with many other state courts that have answered this question, I would hold that the erroneous denial of a defendant's peremptory challenge requires automatic reversal.

*Bell* doesn't settle the matter. Although *Bell* purported to decide that harmless-error review applies to erroneous denials of a defendant's peremptory challenges, only three justices signed that portion of the lead opinion. That statement was also dictum because a majority of the justices concluded that no error had occurred. See *Bell*, 473 Mich at 292-293 (opinion by CORRIGAN, J.) (stating that "[i]n light of our conclusion that the trial court's initial error was cured, we need not address whether a denial of a peremptory challenge is subject to automatic reversal" and noting that *had it concluded* that error occurred, it "*would have* applied a harmless error standard to the error") (emphasis added); *id*. at 300 (WEAVER, J., concurring) (joining the portions of the lead opinion finding no error). Only then-Chief Justice TAYLOR concluded that error had occurred and would have applied harmless-error review. *Id*. at 302 (TAYLOR, C.J., concurring in part and dissenting

9

in part). Indeed, this Court has acknowledged that that portion of the *Bell* lead opinion both lacked majority support and constituted dictum. See *Pellegrino v AMPCO Sys Parking*, 486 Mich 330, 340 n 5; 785 NW2d 45 (2010) ("Only parts I through III of the lead opinion in *Bell* garnered majority support."); *id*. at 348 n 12 (stating that "[t]he lead opinion [in *Bell*] stated in dictum that the improper denial of a peremptory challenge on a basis *other* than race is subject to [harmless-error] analysis").

And, of course, the justices in *Bell* never conducted a harmless-error analysis or concluded that any error in that case was harmless—more evidence that the Court did not decide this question. The Court's statement that harmless-error review applies to erroneous denials of peremptory challenges was unnecessary to the disposition of the case (or even to any alternate holding) and is obiter dictum. "[S]tatements concerning a principle of law not essential to determination of the case are obiter dictum and lack the force of an adjudication[.]" *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 597-598; 374 NW2d 905 (1985). Thus, the remedy issue remains an open question.

The lead opinion acknowledges that state courts post-*Rivera* have divided on the appropriate remedy for the erroneous denial of a peremptory challenge.[2] But despite

---

[2] Of course federal courts have applied harmless-error review post-*Rivera*—they are bound by its holding. See, e.g., *United States v Lindsey*, 634 F3d 541, 550 (CA 9, 2011) ("[A]lthough *Rivera* left the states free to decide the proper remedy for the error at issue, we cannot in good faith apply [the holding in *United States v Annigoni*, 96 F3d 1132 (CA 9, 1996)] here. We are not a separate sovereign that may freely prescribe remedies to our own laws absent a federal constitutional violation. Instead, we are an intermediate court within the federal system, and as such, we must take our cue from the Supreme Court."). States, by contrast, are separate sovereigns, and state courts have an independent duty to ensure that their systems operate fairly.

10

concluding that application of a harmless-error analysis to such errors "will result in almost automatic affirmance," it purports to adopt such a rule. Of course, the issue remains an unsettled one in Michigan law because the lead opinion commands the votes of only three justices.[3] "Plurality decisions in which no majority of the justices participating agree as to the reasoning are not an authoritative interpretation binding on this Court under the doctrine of *stare decisis*." *Negri v Slotkin*, 397 Mich 105, 109; 244 NW2d 98 (1976).

I would adopt an automatic-reversal rule. I agree with the Iowa Supreme Court in *State v Mootz*, 808 NW2d 207, 225 (Iowa, 2012):

> In support of an automatic reversal rule, Mootz argues that the erroneous denial of a peremptory strike is not amenable to harmless error analysis because of the difficulty in showing actual prejudice. This argument has merit. The State has not provided, nor can we conceive of, any situation in which a defendant could ever show prejudice arising out of the wrongful denial of a peremptory challenge where, as is the case here, the juror was not also removable by a challenge for cause. A defendant could only show prejudice by showing that the juror he sought to remove was biased. However, if the juror were biased, then the juror would be removable for cause, and the question regarding the *peremptory* challenge would become moot. [Citations omitted.]

The dissent in *Bell* made a similar point, and the majority offered no response: "Because we have no tools to gauge the effect of errors in denying peremptory challenges, a harmless error analysis of them is simply unworkable." *Bell*, 473 Mich at 317 (KELLY, J., dissenting). And given the "fundamental role" of the peremptory challenge (although it is not of constitutional dimension), *Mootz*, 808 NW2d at 224, a balancing of the interests

---

[3] Indeed, the lead opinion goes out of its way to purportedly resolve issues that remain unresolved because it has the support of only three justices. See, e.g., *ante* at 10 (a "numbers" argument is insufficient to establish a prima facie case of purposeful discrimination under *Batson*); *ante* at 31 (same).

11

involved favors an automatic-reversal rule over the speculative concern that such a rule will discourage trial courts and prosecutors from policing a defendant's discriminatory use of peremptory challenges.

The rationale underlying an automatic-reversal rule in this context is precisely the same as one that drives the structural-error doctrine—the difficulty or impossibility of determining prejudice to the defendant as a result of the error. See *United States v Gonzales-Lopez,* 548 US 140, 149 n 4; 126 S Ct 2557; 165 L Ed 2d 409 (2006) (stating that "here, as we have done in the past, we rest our conclusion of structural error upon the difficulty of assessing the effect of the error"); see also *State v Campbell*, 772 NW2d 858, 862 (Minn App, 2009) ("automatic reversal remains the appropriate remedy when a trial court erroneously denies a defendant's peremptory challenge, even after . . . *Rivera*," because an " 'erroneous denial of a peremptory challenge . . . does not lend itself to harmless error analysis' "), quoting *State v Reiners*, 664 NW2d 826, 835 (Minn, 2003). The lead opinion correctly notes that in *Rivera*, the United States Supreme Court asserted that the defendant's argument that "[t]he improper seating of a juror . . . is not amenable to harmless-error analysis" did "not withstand scrutiny." *Rivera*, 556 US at 157. But the lead opinion misleadingly characterizes that statement as having dispatched the merits argument that the erroneous denial of a peremptory challenge isn't amenable to harmless-error review. The *Rivera* Court did not offer any explanation for *how* such errors could be reviewed for harmfulness; it simply determined that the loss of a peremptory challenge due to a state court's good-faith error could not be a matter of federal constitutional concern. *Id*. That does not "dispatch" the question whether harmless-error review of such errors is impossible.

12

The lead opinion's primary counterargument to a rule of automatic reversal is that the United States Supreme Court in *Rivera* and other cases has said that the erroneous denial of peremptory challenges is not an error of constitutional dimension.[4] So goes the argument—because only structural errors are subject to automatic reversal, and structural errors are constitutional errors, the erroneous denial of peremptory challenges cannot be structural error and therefore cannot be subject to automatic reversal. But that conclusion ignores the Supreme Court's contrary invitation to states in *Rivera*, 556 US at 161-162:

> Absent a federal constitutional violation, States retain the prerogative to decide whether such errors deprive a tribunal of its lawful authority and thus require automatic reversal. States are free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se*.[5]

See also *People v Novotny*, 320 P3d 1194, 1206; 2014 CO 18 (Colo, 2014) (Hood, J., concurring in part and dissenting in part) (stating that "even if we were bound by the Supreme Court's interpretation of the federal harmless error standard when interpreting our own, which we are not, its interpretation 'does not mean that all nonconstitutional errors must be subject to harmless-error analysis' "), quoting *United States v Lane*, 474 US 438, 472; 106 S Ct 725; 88 L Ed 2d 814 (1986) (Stevens, J., concurring in part and dissenting in part).

---

[4] The lead opinion also repeatedly distracts from the ramifications of its remedy holding— a rule of automatic affirmance—with the irrelevant statement (with which none of us would disagree) that a defendant is entitled to a fair trial, not a perfect one. It's a fair trial, not a perfect one, the defendant wants. An imperfect trial can become an unfair trial—the question is whether the erroneous denial of a peremptory challenge causes that.

[5] Confronted with this point, the lead opinion inexplicably doubles down on it. See *ante* at 56 (criticizing this opinion for ignoring "the only guiding statement of law offered by the Supreme Court of the United States to assist state courts" on this point).

13

The lead opinion also cites MCL 769.26 in support of its conclusion. It reasons that automatic reversal can't be the rule because that statute requires a court to find that it "affirmatively appear[s] that the error complained of has resulted in a miscarriage of justice"—which means that the error more probably than not was outcome-determinative, *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999)—before setting aside a conviction. This reasoning is unhelpful because it's virtually impossible to discern whether this error is outcome-determinative. It also neglects additional important statutory text, which provides that an error on any matter of pleading or procedure shall not be a basis for reversal "unless *in the opinion of the court*" the error has led to a miscarriage of justice. MCL 769.26. The statute leaves it to the court's discretion to find a miscarriage of justice, or not. Because a harmless-error rule is unworkable in this context, leaving defendants who are erroneously denied a peremptory challenge without a remedy is a miscarriage of justice.

Finally, this conclusion is also informed and supported by the real-world harm at stake with these errors. It is no secret that people, including prospective jurors, have unconscious biases. See, e.g., Bassett, *Deconstruct and Superstruct: Examining Bias Across the Legal System*, 46 U Cal Davis L Rev 1563, 1577-1578 (2013) (noting "court decisions [that] have recognized that unconscious bias has the potential to impact jurors' perceptions, assessments, and ultimately, their verdicts"). Peremptory challenges—though not constitutionally required—are an important tool for maintaining fair trials by allowing prosecutors and defendants to remove jurors they perceive as being likely to be sympathetic to the other side. See *People v Luciano*, 10 NY3d 499, 502; 890 NE2d 214 (2008) ("Though not a trial tool of constitutional magnitude, peremptory challenges are a mainstay

14

in a litigant's strategic arsenal."). Indeed, here is precisely such a case: despite Juror 5's assertion that she could treat a police officer's testimony the same as any other witness, defense counsel might have reasonably believed her family background would (consciously or not) cause her to be unable to do so.

When a trial court unjustly hampers a defendant's ability to strike a juror without cause—and if that error can never be corrected on appeal—it erodes public trust in the jury system. The lead opinion's approach would give prosecutors free rein to raise frivolous challenges to defendants' use of peremptory challenges to strike jurors who might not be able to decide a case fairly, because if the trial court erroneously grants such a challenge, it won't matter. The lead opinion's approach raises the specter of less fair trials. To me, that would be a disservice to the rule of law, which is sustained by the public's confidence in it.

## IV. CONCLUSION

I would hold that the trial court committed a *Batson* error when it accepted the prosecutor's race-neutral reason for dismissing Juror 2, and I would reverse the Court of Appeals judgment and remand for a new trial on that basis. While I concur with the lead opinion that the trial court erred by refusing to dismiss Juror 5, I disagree with its conclusion that the remedy for the error is to review it using harmless-error analysis. Automatic reversal is appropriate.

Bridget M. McCormack
Richard H. Bernstein
Megan K. Cavanagh

WELCH, J., did not participate in the disposition of this case because the Court considered it before she assumed office.

15